# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 11
U.S. Bank National Association,
&c.,
        Respondent,
    v.
DLJ Mortgage Capital, Inc.,
        Appellant.

Richard A. Jacobsen, for appellant.
Kathleen M. Sullivan, for respondent.
Securities Industry and Financial Markets Association; National Credit Union
Administration Board et al.; CXA-13 Corporation; David L. Ferstendig, amici curiae.

DiFIORE, Chief Judge:

In this residential mortgage-backed securities litigation, we are again called upon to

determine the proper application of a now-familiar contractual "sole remedy repurchase

protocol" provision. Applying well-settled principles of contract interpretation and giving

- 1 -

effect to the plain meaning of the contract language, the repurchase protocol requires that plaintiff trustee provide loan-specific pre-suit notice in order to invoke defendant sponsor's repurchase obligation and satisfy the contractual prerequisite to suit. Furthermore, plaintiff trustee cannot rely on the relation back doctrine of CPLR 203 (f) to avoid the consequences of its failure to comply with the contractual condition precedent with respect to the loans in question prior to commencing this action. We also conclude that the plain language of the parties' agreement limits interest recoverable on liquidated loans to interest that accrued prior to liquidation.

## I.

Plaintiff U.S. Bank National Association is trustee of the Home Equity Asset Trust 2007-1, a residential mortgage-backed securities (RMBS) trust that closed in February 2007. Defendant DLJ Mortgage Capital, Inc., as sponsor of the trust, selected the over 5,100 mortgage loans ultimately placed in the trust. The pooled loans represent the collateral for certificates issued by the trust, which in turn pay principal and interest to certificateholders based on the funds generated by the mortgage borrowers' underlying payments. Pursuant to the pooling and service agreement (PSA) establishing the trust, DLJ made certain representations and warranties, including that each loan was underwritten in accordance with the originators' underwriting standards and applicable law, that certain provided documentation was true and accurate, and that none of the loans were "high cost" or "predatory." As particularly relevant here, the PSA contains a "sole remedy" provision granting U.S. Bank, as trustee, the limited authority to seek a remedy for any breach by DLJ of these representations and warranties through a contractually established

"repurchase protocol" requiring DLJ to cure, repurchase, or substitute a nonconforming mortgage loan within 90 days of notice or independent discovery of such breaching loan.

In November 2011, in its capacity as conservator for the Federal Home Loan Mortgage Corporation (Freddie Mac), the Federal Housing Finance Agency (FHFA) sent two letters to plaintiff trustee asserting that 304 identified loans in the trust breached DLJ's representations and warranties. The FHFA requested that the trustee enforce DLJ's obligation "to repurchase the Subject Loans within 90 days" of notice. The following month, in December 2011, the trustee sent copies of FHFA's letters to DLJ, along with a demand that DLJ "repurchase all loans that breached representations and warranties, including" the 304 loans identified by the FHFA. Approximately three months later, in March 2012, the trustee sent another letter demanding that DLJ cure or repurchase an additional 900 loans identified on an attached schedule. DLJ evaluated the allegations of breach and agreed to repurchase approximately 40 of the loans identified by the trustee, disputing the remaining allegations of nonconformity.

In February 2013, the trustee commenced this breach of contract action, alleging that DLJ was required to repurchase the 1,204 loans identified in its letters, along with "all other Mortgage Loans in the Trust as to which DLJ breached" representations and warranties. It is undisputed that the complaint was timely filed within the statute of limitations. The trustee alleged that a "loan-level" forensic review revealed a significant number of the loans were in breach of the representations and warranties based on, among other things, borrower misrepresentation of income and occupancy status, miscalculations of borrowers' debt to income ratios, and the charging of high-cost interest on the loans.

According to the complaint, DLJ's obligation to repurchase was triggered by the trustee's letters providing notice of nonconforming loans in accordance with the repurchase protocol. The trustee eventually filed a second amended complaint adding an allegation—not at issue on this appeal—that DLJ was also obligated to repurchase any loan that DLJ had independently discovered was in breach.

Following certain procedural history not relevant here, DLJ moved to dismiss the second amended complaint. In pertinent part, DLJ sought dismissal as to any loans other than the 1,204 loans identified in the trustee's pre-suit letters to the extent such claims were premised upon notice having been provided, arguing that the repurchase remedy had not been invoked with respect to any loan not specifically identified by the trustee. DLJ argued that, aside from allegations of independent discovery, no action could be maintained upon loans that were not specifically identified as nonconforming before the litigation commenced due to noncompliance with the contractual prerequisite to suit. Supreme Court denied DLJ's motion, concluding that the trustee's December 2011 breach letter "provided notice to DLJ of its obligation to repurchase 'all loans that breached representations and warranties'" (2015 NY Slip Op 32875[U], *5 [Sup Ct, NY County 2015]).

Litigation continued and, during discovery, the trustee's expert reviewed 1,059 of the loans in the trust—including both previously noticed and unnoticed loans—and identified 783 allegedly nonconforming loans. Only 303 of these loans had been specifically identified by the trustee in its pre-suit letters; the remaining 480 loans were not listed in the schedules of breaching loans provided to DLJ prior to commencement of the action. The trustee also proffered an expert opinion computing the repurchase price for the

allegedly noncompliant loans with interest on the unpaid principal balance of each loan— even those that had been liquidated—calculated so as to include "accrued and unpaid interest" through the "Repurchase Date" set at 90 days after the December 2011 breach letter.

DLJ subsequently moved for partial summary judgment, arguing, as relevant here, that the trustee could not pursue recovery for the 480 loans not specifically identified in the pre-suit letters to the extent that the trustee relied on a notice, rather than an independent discovery, theory. Further, DLJ sought summary judgment with respect to the method of calculation of the repurchase price, arguing that—under the PSA—no interest should be included past the date that any loan was liquidated because no interest "accrued" following liquidation.

Supreme Court denied DLJ's motion (2018 NY Slip Op 33383[U] [Sup Ct, NY County 2018]). [1] With regard to the 480 loans, the court adhered to its prior rationale for denying DLJ's motion to dismiss—namely, that the trustee's pre-suit letters fulfilled the contractual obligation to provide prompt notice of nonconforming loans, triggering the repurchase protocol with respect to all the loans in question. The court further concluded, in any event, that "because the repurchase letters identified some timely claims, the later-identified claims relate back to the original filing" (*id.* at *29). Addressing interest, Supreme Court recognized that DLJ's position had "some logic to it" but nevertheless

[1]  Supreme Court also denied the trustee's cross motion for partial summary judgment, which is not at issue on this appeal.

rejected the contention that interest ceased accruing on liquidated loans for purposes of calculating the repurchase price (*id.* at 31).

The Appellate Division affirmed the order denying DLJ's motion for partial summary judgment, concluding that the trustee's December 2011 letter timely informed DLJ "that a substantial number of identified loans were in breach, and that the pool of loans remained under scrutiny, with the possibility that additional nonconforming loans might be identified" (176 AD3d 466, 466 [1st Dept 2019]). According to the Appellate Division, this "notice complied with the contractual condition precedent of notifying [DLJ] of its default, such that subsequently identified loans, including the 480 identified by [the trustee's] expert during discovery, related back to the time of the initial notice" (*id.*). Further, the Court agreed with Supreme Court that "interest could be calculated on liquidated loans, at the applicable mortgage rate, up until the repurchase date" (*id.* at 467). The Appellate Division granted DLJ leave to appeal to this Court, certifying the question of whether its order was properly made. We now reverse.

II.

We first address the parties' dispute regarding whether DLJ was entitled to summary judgment to the extent the claims pertain to the 480 loans that were not identified in the trustee's pre-suit letters on the ground that the trustee failed to provide the prompt notice required by the repurchase protocol—a contractual condition precedent to suit.[2] DLJ

_____

[2] As already noted, the trustee has sought to recover on these same loans under a theory that DLJ independently discovered the breaches. The parties agree that such a theory is not before us and, thus, we address only whether the complaint may be maintained with

argues that, in denying its motion for summary judgment, the courts below ignored the plain language of the sole remedy provision requiring pre-suit notice of each specific loan claimed to be nonconforming, followed by an opportunity to cure or repurchase the identified loans, prior to the commencement of any action for breach premised upon such loans. Further, DLJ asserts, the "relation back" doctrine of CPLR 203 (f) is not available to "cure" the trustee's failure to comply with the contractual requirement to provide pre-suit notice for the 480 loans first identified by the trustee's expert years after the litigation commenced.

In response, the trustee contends that its December 2011 and March 2012 letters adequately put DLJ on notice of its obligation to repurchase *any* breaching loans—including the 480 loans later identified during discovery—and that the language of the PSA does not require loan-specific notice for each individual breaching loan as a prerequisite to a repurchase action. In any event, even if loan-specific notice is required, the trustee argues that the notice requirement of the repurchase protocol was satisfied by its expert's identification of the 480 additional loans after the action was commenced. Finally, relying on CPLR 203 (f), the trustee asserts that its claims with respect to the 480 loans at issue "relate back" to its timely complaint, such that they are properly interposed.

As with much of our RMBS precedent, this controversy presents a question of contract interpretation fitting within "a consistent theme: does the contract mean what it says?" (*Matter of Part 60 Put-Back Litig.*, 36 NY3d 342, 348 [2020]). Freedom of contract

---

respect to the 480 loans insofar as the trustee seeks recovery based upon the theory that it provided sufficient notice to pursue a remedy as to those loans.

is an important and deeply rooted public policy in this State (*see id.* at 355; *2138747 Ontario, Inc. v Samsung C&T Corp.,* 31 NY3d 372, 377 [2018]).  "Absent some violation of law or transgression of a strong public policy, the parties to a contract are basically free to make whatever agreement they wish" (*Rowe v Great Atl. & Pac. Tea Co.*, 46 NY2d 62, 67-68 [1978]), and "[f]reedom of contract prevails in an arm's length transaction between sophisticated parties" such that courts generally may not "relieve them of the consequences of their bargain" (*Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co.*, 86 NY2d 685, 695 [1995]; *see Matter of Part 60 Put-Back Litig.*, 36 NY3d at 355).  Thus, "'when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms'" (*Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc.*, 30 NY3d 572, 581 [2017], quoting *W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990]).  Further, "[c]ourts may not 'by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing'" (*Riverside S. Planning Corp. v CRP/Extell Riverside, L.P.*, 13 NY3d 398, 404 [2009], quoting *Reiss v Financial Performance Corp.*, 97 NY2d 195, 199 [2001]).

In accordance with these bedrock principles, "'courts must honor contractual provisions that limit liability or damages because those provisions represent the parties' agreement on the allocation of the risk of economic loss in certain eventualities'" (*Ambac Assur. Corp. v Countrywide Home Loans, Inc.*, 31 NY3d 569, 581 [2018], quoting *Nomura*, 30 NY3d at 581).  To that end, in the RMBS context, we have repeatedly enforced sole remedy provisions—a typical component of these transactions—in accordance with their

plain terms, as such provisions are "sufficiently clear to establish that no other remedy was contemplated by the parties at the time the contract was formed" (*Nomura*, 30 NY3d at 582; *see Matter of Part 60 Put-Back Litig.*, 36 NY3d at 352; *Ambac Assur. Corp.*, 31 NY3d at 581-582). Indeed, as we explained in *ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v DB Structured Prods., Inc.*, compliance with the sole remedy provision is a "procedural prerequisite to suit" and, absent satisfaction of this contractual condition precedent, an action is not validly commenced (25 NY3d 581, 598 [2015]).

Here, the sole remedy provision, section 2.03 of the PSA, states that, "[u]pon discovery by any of the parties . . . of a breach" of the relevant representations or warranties that materially and adversely affects the Certificateholders' interest "*in any Mortgage Loan*, the party discovering *such breach* shall give *prompt notice thereof* to the other parties" (PSA § 2.03 [d] [emphasis added]). Upon receipt of proper notice of a breach that materially affects the value of the "related *Mortgage Loan*," a 90-day period commences during which DLJ must "cure *such breach* in all material respects, and if *such breach* is not so cured," DLJ must either "remove *such Mortgage Loan* . . . from the Trust Fund and substitute in its place a Qualified Substitute Mortgage Loan" (if less than two years had elapsed since closing) or "repurchase *the affected Mortgage Loan or Mortgage Loans* from the Trustee at the Repurchase Price" (PSA § 2.03 [d] [emphasis added]). The "Repurchase Price"—the only recovery for a breach—is calculated pursuant to a specific formula based on the outstanding principal balance of the particular nonconforming loan (PSA § 1.01). Further, the parties agreed that DLJ's "obligation . . . to cure, repurchase or substitute *any*

*Mortgage Loan as to which a breach has occurred* and is continuing shall constitute the sole remedy . . . respecting *such breach*" (PSA § 2.03 [d] [emphasis added]).

A simple reading of the above-quoted provision demonstrates that the trustee's assertion that loan-specific notice is not required is inconsistent with the contractual language of the repurchase protocol. The parties structured the repurchase protocol entirely through the lens of individual "mortgage loans"—clearly contemplating a loan-by-loan approach to the agreed-upon sole remedy for breach. The framework for repurchase is consistently phrased in a singular and individualized manner—requiring first the identification of a *specific* breaching "Mortgage Loan" and then, if the breach is substantiated as to *that loan*, the removal and substitution or repurchase of *that particular loan* from the trust. To that end, the sole measure of recovery for a nonconforming loan— i.e., the "repurchase price"—is also loan specific, depending on the outstanding balance of that particular loan. This language makes DLJ's obligation to cure, repurchase, or substitute a loan contingent—as relevant here—upon notification and allegation of breach as to an individually identified loan. Indeed, this is the only sensible reading of the repurchase protocol.[3] The trust here contains over 5,000 mortgage loans and, in order for DLJ to cure, repurchase, or substitute a claimed nonconforming loan or loans, it must know *which* loans are alleged to be in material breach of the representations and warranties.

---

[3] Contrary to the dissent's assertion, this conclusion is not based merely on the repurchase protocol's "reference to the singular" (dissenting op at 8) but, rather, is the only reasonable interpretation of the overall language, structure, and purpose of that provision.

That the parties contracted for an abridged 90-day window for DLJ to determine whether to cure, substitute, or repurchase also underscores that the parties could only reasonably have intended and understood the notice requirement to operate on a loan-by-loan basis. The "prompt notice" required by the contract must be considered within the context of its purpose—which is not merely to inform DLJ that there was some unidentified alleged breach of the representation and warranties but, rather, to trigger the agreed-upon sole remedy: DLJ's obligation to cure, substitute or repurchase a *particular* nonconforming loan or loans within 90 days. To determine whether the inclusion of an individual loan in the trust breached the representations and warranties, DLJ must inspect the underlying mortgage file for that loan—as evidenced by the loan-level nature of the trustee's allegations of breach—a process hardly possible within the abbreviated cure period if the allegedly nonconforming loans are not clearly identified by the party claiming breach. Reading the sole remedy repurchase protocol in "light of the [contractual] obligation as a whole and the intention of the parties manifested thereby," any contention that the repurchase protocol for *all* loans in the trust can be invoked by claiming that *some* loans breached is simply untenable (*Cortlandt St. Recovery Corp. v Bonderman*, 31 NY3d 30, 39 [2018] [quotation marks and internal citations omitted]). Compliance with the repurchase protocol requires notice of each individual loan alleged to be in breach.[4]

---

[4] Indeed, the FHFA recognized the loan-specific nature of the repurchase protocol inasmuch as it identified specific allegedly nonconforming "Subject Loans," requested that the trustee seek repurchase by DLJ of only those identified "Subject Loans" within 90 days after DLJ "receive[d] notice of the identified breaches," and reserved its rights to "identify other Mortgage Loans" with respect to which breaches may have occurred.

Our recent precedent—which has characterized similar contractual provisions as loan-specific and has consistently rejected attempts to circumvent the sole remedy repurchase protocol through allegations of pervasive breach—supports this conclusion. For example, in *Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc.*, we declined to interpret the sole remedy provision as applying "only to occasional mortgage *loan-specific* breaches," pointing out that—as here—the relevant language did "not provide a carve-out . . . where a certain threshold number of loan breaches are alleged" (30 NY3d at 585 [emphasis added]). Similarly, in *Ambac Assur. Corp. v Countrywide Home Loans, Inc.*, we refused to limit the parties' sole remedy repurchase protocol to "loan-level" breaches or otherwise conclude it was inapplicable to "transaction-level" allegations of breach, reiterating that the plaintiff could not "subvert" the sole remedy provision "by simply re-characterizing its claims" (31 NY3d at 582 [internal quotation marks and citations omitted]). Even more recently, we determined that the trustee could not avoid compliance with the sole remedy provision by alleging gross negligence, rejecting the trustee's claim that allegations of a pervasive breach of the representations and warranties should relieve it of the burden "to prove its case on a loan-by-loan basis" (*Matter of Part 60 Put-Back Litig.*, 36 NY3d at 357).

Here, the trustee's assertion that the repurchase protocol can be invoked for certain breaching loans through an allegation that *other* loans are nonconforming is nothing more than an attempt to avoid the consequences of the sole remedy provision and pursue claims of "pervasive" breach without having adequately complied with the notice requirements of the repurchase protocol. Yet again, we "conclude that the parties' contract, as written,

means what it says" (*id.* at 348). The plain language of the sole remedy provision agreed upon by the parties requires identification of the specific loans alleged to be in material breach in order to invoke the repurchase protocol for such loans and satisfy the contractual condition precedent to suit. In so concluding, we honor the parties' decision to include contractual provisions that limit recovery, giving effect to the "parties' agreement on the allocation of the risk" (*Nomura*, 30 NY3d at 581).

Alternatively, the trustee argues that, if loan-specific identification is necessary under the PSA, sufficient notice has nevertheless been provided to DLJ through its post-suit expert disclosure identifying the additional 480 nonconforming loans because the PSA does not mandate *pre-suit* notice. We disagree. The repurchase protocol sets forth the mechanism that—upon prompt notice to DLJ of an allegedly nonconforming loan, a repurchase demand, and an opportunity to cure—is the negotiated "sole remedy" for any nonconforming loans included in the trust in breach of DLJ's representations and warranties. As such, it necessarily follows that no action may be validly commenced to recover in connection with a particular loan until the repurchase protocol has been invoked with respect to that loan, the cure period has expired, and DLJ has failed to adhere to the contractually agreed-upon remedy for the breach.

The pre-suit nature of the repurchase protocol is demonstrated by our holding in *ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2* (25 NY3d 581). There, we clarified that the repurchase protocol is the sole remedy permitted under the contract for breach of the representations and warranties, and that compliance with its notice requirements is a "procedural prerequisite to suit" (*id.* at 598) in the absence of which the

action was "not validly commence[d]" (*id.* at 589). Thus, *ACE* illustrates that the trustee must give notice and an opportunity to cure or repurchase under a repurchase protocol *before* commencing litigation. Likewise, here, pre-suit notice by the trustee was required to fulfill the "procedural prerequisite to suit" and its expert's identification of additional loans four years into litigation does not cure the failure to comply with that contractual requirement.

*U.S. Bank N.A. v DLJ Mtge. Capital, Inc.* (33 NY3d 72 [2019]) does not compel a different conclusion as nothing in our decision in that case approves of post-suit notice. There, the trustee "filed an action within six years of the execution" of the relevant agreements but the action was dismissed "without prejudice" due to its failure to fully comply with the contractual condition precedent inasmuch as it had provided notice of 1,124 specific nonconforming loans to a backstop sponsor but not the primary obligor— the loan originator—before commencing the action to recover for those nonconforming loans (*id.* at 77). The question before us was whether the dismissal of the complaint against the backstop sponsor should have been "with prejudice" to a potential future recommencement of the action under CPLR 205 (a)—a statutory provision permitting plaintiffs to recommence an action within six months of a non-merits dismissal provided the original action was commenced within the statute of limitations, even if the action would be time-barred at the time of recommencement. We determined that the dismissal based on the partial failure to give pre-suit notice pursuant to the contractual condition precedent did not constitute a timeliness dismissal within the meaning of CPLR 205 (a)— and we declined the backstop sponsor's invitation to disturb the "without prejudice"

dismissal on that basis. However, that the dismissal—based solely on failure of a procedural condition precedent—did not render the action untimely for statute of limitations purposes in no way excused the trustee from its obligation to fully satisfy the contractual pre-suit notice requirements for each loan prior to commencement of any action thereon (*see ACE*, 25 NY3d at 598), as reflected in our statement that "no action for breach of the representations and warranties may be brought until [the loan originator] has had 90 days to cure or repurchase the allegedly noncompliant loans" (*U.S. Bank N.A.*, 33 NY3d at 76).

The trustee's reliance on CPLR 203 (f) fares no better. Pursuant to CPLR 203 (f), when a valid and timely action has been commenced, a "claim asserted in an amended pleading" may be deemed to relate back to the timely interposed complaint so long as the original complaint gave "notice of the transactions, occurrences, or series of transactions or occurrences" upon which the new claim is based. Here, the trustee did not attempt to invoke CPLR 203 (f) after filing an amended complaint to add new claims following satisfaction of the condition precedent with respect to the 480 loans at issue, but rather identified these loans in an amended reply expert report—a fact that is completely ignored by the dissent.

Moreover, to the extent that the Appellate Division suggested that the trustee's post-suit identification of loans "related back to the time of the initial notice" (176 AD3d at 466), we clarify that CPLR 203 (f) and the relation back doctrine provides a vehicle in the context of civil litigation to excuse noncompliance with other statutory procedural requirements. It has no application here to excuse the trustee's failure to comply with the

contractual prerequisite to suit. The parties agreed to a limited remedy for the inclusion of nonconforming loans in the trust and made that remedy available only if the trustee first complied with certain loan-specific notice requirements, providing the sponsor an opportunity to cure or repurchase the identified loans. "Express conditions must be literally performed; substantial performance will not suffice" (*MHR Capital Partners LP v Presstek, Inc.*, 12 NY3d 640, 645 [2009]). We cannot rewrite the contract by substituting a different, post-suit notice procedure in place of the one chosen by the parties.

In sum, pursuant to the plain language of the repurchase protocol—the parties' agreed-upon "sole remedy" for breach—the trustee was required to give pre-suit, loan-specific notice of allegedly nonconforming loans prior to commencing an action to recover the repurchase price for such loans. The trustee failed to satisfy this prerequisite to suit with respect to the 480 loans at issue and, thus, the trustee cannot seek recovery on those loans to the extent it asserts that DLJ's repurchase obligation was triggered by notice, as compared to independent discovery.

### III.

The second issue presented on this appeal is a dispute over the proper calculation of the "Repurchase Price"—which the parties agree is the only remedy that may be recovered for a nonconforming loan pursuant to the repurchase protocol. The "Repurchase Price" of a mortgage loan is defined in the PSA as "an amount equal to the sum of" the "unpaid principal balance" of the loan on the date of repurchase, plus "accrued and unpaid interest" on the mortgage loan "from the date through which interest was last paid by the Mortgagor to the Due Date in the month in which the Repurchase Price is to be distributed to the

Certificateholders" (PSA § 1.01). DLJ does not dispute that it must pay the repurchase price where there has been compliance with the repurchase protocol with respect to a liquidated loan that is ultimately determined to be in breach. However, DLJ contends that, with respect to such loans, the phrase "accrued and unpaid interest" refers only to interest that accrued on such loans prior to liquidation since, following liquidation, the loan no longer "accrue[s]" interest. We agree.

The PSA's inclusion in the repurchase price of "accrued and unpaid interest" on a mortgage loan plainly refers to interest that has accumulated on a loan but that has not yet been paid (*see* Black's Law Dictionary [11th ed 2019], accrue). The trustee does not dispute that, upon liquidation, interest no longer "accrue[s]" on a mortgage loan.[5] The trustee nevertheless asserts that, if the parties intended to exclude post-liquidation interest, the PSA would expressly limit the repurchase price to interest "actually" accrued. However, such redundancy is not necessary to understand the definition of "Repurchase Price" as excluding post-liquidation interest, which limitation is implicit in the parties' agreement that only "accrued" interest is included in the repurchase price. Thus, the parties agreed that calculation of the repurchase price would not include post-liquidation interest.

---

[5] The PSA defines a "Liquidation Mortgage Loan" as "a defaulted Mortgage Loan . . . which was liquidated" and as to which the loan servicer "has received all amounts it expects to receive in connection with the liquidation of such Mortgage Loan" (PSA § 1.01). The PSA also defines the "Liquidation Proceeds" as "[a]mounts . . . received in connection with the partial or complete liquidation of defaulted Mortgage Loans, whether through trustee's sale, foreclosure sale, or similar disposition" (PSA § 1.01).

Accordingly, the order of the Appellate Division insofar as appealed from should be reversed, with costs, defendant's motion for partial summary judgment granted in accordance with this opinion, and certified question answered in the negative.

RIVERA, J. (dissenting in part):

Plaintiff U.S. Bank National Association as trustee for a residential mortgage-backed securities (RMBS) fund sponsored by defendant DLJ Mortgage Capital, Inc., notified DLJ that numerous specified loans in the fund were allegedly in breach of DLJ's representations and warranties and demanded remedial action on all defective loans. This

- 1 -

came as no surprise, as DLJ was on prior notice from a certificateholder's conservator of these alleged defective loans and a similar demand that DLJ remedy its default. DLJ concedes that U.S. Bank's notice was sufficient to trigger its remedial obligations but alleges that the scope of the notice is limited to the loans listed. The lower courts rejected this argument—and rightly so, because the notice alerted DLJ to its alleged breaches and attendant impact on the securitized loan pool and expressly stated it was not limited to loans identified at the time. This was all the notice DLJ was entitled to under the RMBS agreement. Moreover, U.S. Bank's complaint sufficiently set forth the transactions and occurrences within the meaning of CPLR 203 (f), so that additional defective loans identified by U.S. Bank during discovery related back to the original timely filing date. In contravention of our rules of contract interpretation, the majority adopts a notice requirement more burdensome than what the parties agreed to. The Court takes one misstep further and limits the relation back doctrine in contravention of the intent and purpose of the CPLR. The majority's holding is at odds with the obligations imposed by the RMBS agreement to remedy defective loans—obligations intended to prevent DLJ from avoiding liability for the types of egregious pool-wide violations alleged here.

I.

This appeal involves breach-of-contract claims by plaintiff U.S. Bank, the trustee of an RMBS fund called the Home Equity Asset Trust 2007-1 (HEAT), against the RMBS sponsor defendant DLJ. The HEAT formation and securitization documents include a

pooling and servicing agreement (PSA) that sets forth DLJ's representations and warranties applicable to the 5,153 loans in the trust.

The PSA includes the now familiar remedial protocol and damages formula for material breaches, which provides,

> "[u]pon discovery by any of the parties [to the PSA] of a breach of a representation or warranty . . . that materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties. [DLJ] hereby covenants that within 90 days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty made by it . . . which materially and adversely affects the value of the related Mortgage Loan or the interests of the Certificateholders, it shall cure such breach in all material respects, and if such breach is not so cured, shall . . . repurchase the affected Mortgage Loan or Mortgage Loans from the trustee at the Repurchase Price in the manner set forth [in this agreement]."

After the execution date of the PSA, the Federal Housing Finance Agency (FHFA)—acting as conservator of a certificateholder—notified DLJ in two separate letters that at least 300 loans held in the HEAT trust breached the PSA's representations and warranties and demanded that DLJ repurchase those loans.

FHFA identified the loans in schedules attached to those letters. It noted that its demand was "not intended as a full and complete statement of all relevant facts and claims" and that it "reserve[d]" its right "to identify additional breaches of representations and warranties respecting the Subject Loans and to identify other Mortgage Loans with respect

to which [DLJ] may have breached one or more of the representations and warranties contained in the PSA."

The following month, U.S. Bank wrote to DLJ and included FHFA's letters as an attachment. U.S. Bank reminded DLJ that, under the PSA, DLJ was "obligated to repurchase every loan that did not comply with a representation or warranty" and demanded that it "repurchase all loans that breached the representations and warranties, including" the loans identified by FHFA. Three months later, U.S. Bank sent another letter to DLJ demanding that DLJ cure or repurchase 900 allegedly breaching loans identified in an attached schedule.

After DLJ refused to cure or repurchase all but 40 loans, U.S. Bank filed the instant action demanding repurchase of all the allegedly breaching loans. The second amended complaint referenced the prefiling notice provided by FHFA's and U.S. Bank's correspondence. U.S. Bank asserted that an expert forensic review revealed that, out of 1,510 examined loans, 1,204—nearly 80%—breached the PSA's representations and warranties. A loan-level review of an additional 1,000 loans confirmed that the loan originators "failed to adhere to industry-standard and reasonable underwriting guidelines in an extremely high percentage of cases."

U.S. Bank also quoted from publicly available emails sent from or received by DLJ executives revealing a stunning laxity in DLJ's underwriting standards. Among other statements, the emails noted that "our diligence process is such a joke" and "our expanded

eligibility for every fly-by-night originator was so broad that any loan could, and did, get through what passed for diligence" at DLJ.

DLJ moved to dismiss U.S. Bank's second amended complaint as to loans not specifically identified in the prefiling notice sent before expiration of the applicable six-year statute of limitations.[1] DLJ argued that U.S. Bank had "failed to comply with the Repurchase Protocol in a timely manner" with respect to any loans except for those that U.S. Bank specifically identified before filing suit. U.S. Bank opposed, arguing that its pre-suit letters sufficiently apprised DLJ of its obligation to repurchase all breaching loans and, in any event, DLJ independently discovered the breaching loans triggering DLJ's repurchase obligation. The court denied the motion.

Subsequently, and as relevant here, DLJ moved for partial summary judgment, arguing again that U.S. Bank's recovery was limited to the loans for which it specifically gave notice before the statute of limitations elapsed, and that U.S. Bank's later-noticed claims did not relate back to the filing of the complaint. Furthermore, DLJ argued that the court should hold that the repurchase price does not include interest for liquidated loans after the date of liquidation. Supreme Court rejected DLJ's arguments.

On appeal, the Appellate Division affirmed, holding that U.S. Bank's pre-suit notice "complied with the contractual condition precedent, such that subsequently identified loans . . . related back to the time of the initial notice" (*U.S. Bank N.A. v DLJ Mtge. Capital, Inc.,*

---

[1] The parties do not dispute that the original complaint was timely filed.

*Inc.*, 176 AD3d 466, 466-67 [1st Dept 2019]). Moreover, U.S. Bank was entitled to interest on liquidated loans (*id.* at 467). The Court granted DLJ leave to appeal and certified to this Court the question of whether the order of Supreme Court, as affirmed by the Appellate Division, was "properly made." I agree on one point, for the reasons stated by the majority: U.S. Bank cannot collect liquidated damages (majority op at 2, 16-17). The majority otherwise misreads the agreement and misapplies the CPLR.

## II.

Summary judgment is a "drastic remedy" that should be granted "only where the moving party 'has tender[ed] sufficient evidence to demonstrate the absence of any material issue of fact'" (*Vega v Restani Constr. Corp.*, 18 NY3d 499, 503 [2012], quoting *Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]; *see* CPLR 3212 [b]). Even then, summary judgment should be granted "only if, upon the moving party's meeting this burden, the non-moving party fails 'to establish the existence of material issues of fact which require a trial of the action'" (*id.*, 18 NY3d at 503, quoting *Alvarez*, 68 NY2d at 324). Issue finding, not issue deciding, is the court's purpose at the summary judgment stage (*see Vega*, 18 NY3d at 505, citing *Sillman v Twentieth Century-Fox Film Corp.*, 3 NY2d 395, 404 [1957]). Thus, "[w]here the court entertains any doubt as to whether a triable issue of fact exists, summary judgment should be denied" (*Daliendo v Johnson*, 147 AD2d 312, 317 [2d Dep't 1989]). When ruling on a motion for summary judgment, the deciding court must view the facts "in the light most favorable to the non-moving party" (*Ortiz v Varsity Holdings, LLC*, 18 NY3d 335, 339 [2011]).

Here, DLJ must establish both that the prefiling notice is inadequate and that U.S. Bank cannot rely on CPLR 203 (f) to refer back to its original complaint in support of damages for later-identified allegedly defective loans based on the same transactions or occurrences noticed in the complaint. It failed to carry its burden on both counts.

III.

The majority correctly begins the analysis with the language of the agreement, but misconstrues that language to impose a requirement of individualized notice (majority op at 10). The majority reaches this conclusion first by reading language into the agreement. But, as the majority recognizes, our well-established rules prohibit judicial rewriting of contracts (*see* majority op at 8, quoting *Riverside S. Planning Corp. v CRP/Extell Riverside, L.P.*, 13 NY3d 398, 404 [2009] ["Courts may not 'by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing'"], quoting *Reiss v Financial Performance Corp.*, 97 NY2d 195, 199 [2001]).

Turning to the RMBS agreement, the securitization documents do not define what constitutes adequate notice for purposes of the repurchase protocol. Nowhere does the PSA state that a certificateholder or the trustee must identify a particular loan or how to set forth a breach of the representations and warranties (*see* majority op at 9-10). The PSA merely provides that, "upon discovery . . . of a breach of a representation or warranty . . . that materially and adversely affects the interest of the Certificateholders in any Mortgage

Loan, the party discovering such breach shall give prompt notice thereof to the other parties." That notice requirement was satisfied here.

The FHFA letters specifically notified DLJ of 304 breaching loans worth approximately 55 million dollars, and that there were more that were unidentified. U.S. Bank's first prefiling letter identified the same breaching loans and demanded that "DLJ repurchase all loans that breached the representations and warranties." U.S. Bank's second letter identified an additional 900 loans, for a total of 1,204—approximately 23% of the loans in the trust. This was sufficient notice of widespread breaches of the representations and warranties throughout the RMBS trust, and it triggered DLJ's obligation to remedy its default.

The majority and DLJ interpret the agreement to require that the notice be provided on a loan-by-loan basis, and, as a corollary, that the trustee cannot assert that there were widespread breaches without separately identifying each loan affected by the breach (*see* majority op at 10). This argument has no textual support. Nowhere does the PSA foreclose a trustee or certificateholder from providing notice by identifying breaches of the representations and warranties as they affected specific loans—here constituting over 20% of the loan pool—as examples of DLJ's widespread failure to comply with those representations and warranties.

The majority's textual reading turns on a reference to the singular "[l]oan" in the PSA's repurchase protocol (*see* majority op at 9-10, 10 n 3). This is by no means dispositive of the drafters' intent for loan-specific notice. Read in context, the provision encompasses

the plural form of the terms "[l]oan" and "breach." Indeed, the same provision upon which the majority relies states that DLJ "*shall . . . repurchase the affected Mortgage Loan or Mortgage Loans,*" indicating that notice can be provided for multiple loans. Moreover, the provision refers to "a breach of a representation or warranty," thus requiring notice of the representation and warranty that DLJ failed to comply with, notice of which U.S. Bank provided. Despite these textual indicators, the majority states that their view is the "only reasonable interpretation of the overall language, structure, and purpose of that provision" (*see* majority op at 10 n 3). However, saying something is the "only reasonable view," does not make it so. In fact, Supreme Court held that DLJ's reading of the PSA "imposed a more stringent notice requirement" and pointed to several other cases reaching the same conclusion (*see U.S. Bank N.A. v DLJ Mtge. Capital, Inc., Inc.*, 2018 N.Y. Slip Op. 33383(U), \*12 [Sup Ct , NY County 2018]). So much for the majority's "only reasonable interpretation." In any case, as I discuss, all these "indicators" lead to a result contrary to the majority's reading of the repurchase protocol.

The majority also misinterprets the purpose of the framework for repurchasing (*see* majority op at 10-11). The fact that the parties contracted for an abridged 90-day window for DLJ to determine whether to cure, substitute, or repurchase does not "underscore[] that the parties could only reasonably have intended and understood the notice requirement to operate on a loan-by-loan basis" (*id.* at 11). The 90-day period applies regardless of the type or number of alleged breaches and affected loans. DLJ is stuck with this negotiated timeframe, even if it turns out that DLJ needs more time to make an informed decision on

how to act. And, it very well could. Hypothetically, if U.S. Bank provided notice of representation and warranty breaches as to each of the more than 5,000 mortgage loans in the pool, DLJ has the same amount of time to remedy as if U.S. Bank had sought relief for only one defective loan. It is absurd to think that DLJ could have possibly examined within 90 days each and every loan to determine if it should cure, substitute, or repurchase. But, that is what the agreement provides, and so the parties are bound by it. Indeed, "freedom of contract prevails in an arm's length transaction between sophisticated parties such as these, and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain. If they are dissatisfied with the consequences of their agreement, the time to say so [was] at the bargaining table" (*Oppenheimer & Co., Inc. v Oppenheim, Appel, Dixon & Co.*, 86 NY2d 685, 695 [1995] [internal quotation marks and citation omitted]).

Similarly unpersuasive is the majority's recrafting of U.S. Bank's claim as an attempt to trigger the repurchase protocol for all loans by referencing some loans (*see* majority op at 11). This word play falls flat because U.S. Bank is not seeking a repurchase for every loan, but only those which are identified and proven to be out of compliance with the agreement. A simple example clarifies the point. Assume you purchase 100 cars from a dealer who represents that they all are equipped with new tires and who warrants that the dealer will buy back any car or cars with used tires or replace the tires with new ones. When the cars are delivered, you examine them and find that twenty of the cars have used tires. You inform the dealer and say that you'll continue with your examination but want the

dealer to comply with the promise to buy back any car with used tires or provide the new tires. The dealer buys back one of the twenty cars. It is obvious that the dealer is on notice that there is a problem with the cars and that you want the problem taken care of for all the cars equipped with used tires. Here, U.S. Bank through its notice and reference to the FHFA notice, made clear to DLJ that there were alleged breaches that materially affected the loan pool, that it was continuing to identify the impacted loans, and that it was demanding that DLJ remedy its default in accordance with the agreement.

The majority erroneously relies on our decisions in *Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc.* (30 NY3d 572 [2017]), *Ambac Assur. Corp. v Countrywide Home Loans, Inc.* (31 NY3d 569 [2018]), *ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v DB Structured Prods, Inc.* (25 NY3d 581 [2015]), and *U.S. Bank N.A. v DLJ Mtge. Capital, Inc.* (33 NY3d 72 [2019]). The specific issue of the type of notice required was not at issue in those appeals.

In *Nomura* we rejected a trustee's attempt to bring a general breach-of-contract claim based on a "no untrue statement" provision in the contract (30 NY3d at 577). Instead, we held that the sole remedy for breaches of the mortgage loan-specific representations and warranties was a provision mandating cure or repurchase (*id.* at 577, 585 [holding that "there is no support in the governing agreements for the position of (plaintiff) that the Sole Remedy Provision applies only to occasional mortgage loan-specific breaches, whereas pervasive (or 'aggregate') breaches are addressed under" the sole remedy provision]). In *Ambac*, we held that a contract's sole remedy provision applied to "transaction-level"

representations about a defendant's operation and financial condition (31 NY3d at 581-583). And, in *Ace,* we held that plaintiff's cause of action for breach of representations and warranties accrued at the point of contract execution (*see* 25 NY3d at 589). Finally, in *U.S. Bank* we held that an RMBS trustee could file a second action in accordance with CPLR 205 (a) when its first action was timely filed and dismissed for failure to comply with the contractual notice and cure or repurchase condition precedent (*see* 33 NY3d at 75, 82).[2] Thus, our prior holdings clarified that a plaintiff's action for breach of the RMBS agreement accrues upon execution of the contract, including an action claiming pool-wide breaches, and that failure to provide notice of a breach in accordance with the cure and repurchase provision within the six year statute of limitations is not fatal to the filing of a subsequent action within six months of the dismissal of the original complaint once contractual notice is provided. The Court, in those appeals, did not conclude or suggest that the type of notice provided here is no notice at all.

U.S. Bank timely notified DLJ of allegedly noncompliant loans and that the breaches affected other loans in the pool which were continuing to be identified. Unlike the parties in *Nomura*, *Ambac* and *Matter of Part 60 Put Back Lit*. (36 NY3d 342, 348 [2020]), DLJ was notified that there were problems with the loan pool as illustrated by the

---

[2] As discussed in section IV, *infra*, the decision in *U.S. Bank* supports application of CPLR 203 (f) and the relation back doctrine so that U.S. Bank can seek damages for defective loans based on the transactions and occurrences described in the complaint and discovered post-filing.

listed loans in the notice, and that the alleged breaches affected other loans. Nothing in our prior decisions suggests that such notice is inadequate or contrary to the agreement.

Nor is it true, as the majority claims, that without a loan specific number DLJ was unable to conduct the investigation necessary to comply with its remedy obligations (*see* majority op at 11). To the contrary, DLJ was well aware of the representations and warranties and could have reviewed the pool based on the information provided in the notice. What more did U.S. Bank need after the FHFA and U.S. Bank advised it of how the breaches impacted the securitization pool? Afterall, DLJ "as sponsor of the trust, selected the over 5,100 mortgage loans ultimately placed in the trust" (majority op at 2). With that insider knowledge DLJ was uniquely positioned to cure or repurchase defective loans once notified of the alleged problems with the pool.

Notably, DLJ failed to indicate in its correspondence with U.S. Bank that it believed the provision applied only to loans specifically identified by the trustee or certificateholder. Nor, for that matter, that it needed additional time to make an informed decision of how to proceed. DLJ remained silent rather than expressly reject the demand to repurchase all breaching loans for lack of individual loan specificity. Instead, DLJ reviewed the list of loans provided and agreed to repurchase approximately 3% of them, with no suggestion that it was choosing not to consider U.S. Bank's demand concerning other loans. In fact, DLJ stated in its March 5, 2012 letter to U.S. Bank that it was continuing to review "the allegations in the Repurchase Demands" from FHFA and U.S. Bank, and that it "reserves all rights, including the right to amend [its] response based on, without limitation, further

review of the loan documents and data, and additional information subsequently provided by FHFA or U.S. Bank." Thus, DLJ indicated that it was continuing to review the claimed breaches and that it would consider additional information from FHFA and U.S. Bank regarding their allegations. Given that FHFA and the trustee expressly reserved the right to provide additional information about the breaches with further loan examples, DLJ's correspondence kept the door open to further claims and indicates it was on notice of the transactions that led to its alleged violations of the representations and warranties.

IV.

U.S. Bank is also correct that CPLR 203 (f) applies and that the claims concerning loans identified post-filing relate back to when U.S. Bank timely filed its original complaint. CPLR 203 (f) provides that "[a] claim asserted in an amended pleading is deemed to have been interposed at the time [that] the claims in the original pleading were interposed, unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading." The doctrine of relation-back is aimed at balancing the CPLR's relaxation of "strict, formalistic pleading requirements" with the important policies underlying statutes of limitations (*Buran v Coupal*, 87 NY2d 173, 177 [1995]). Indeed, New York's relation-back doctrine is "even more liberal than the federal provision" (1 Weinstein-Korn-Miller, NY Civ Prac: CPLR ¶ 203.29 [2021]). The CPLR requires only "notice" of the transactions or occurrences (or series of transactions or occurrences), and not that the claim "arose out

of" the same conduct, transaction or occurrence, as its federal counterpart mandates (Fed

Rules Civ Pro rule 15 [c]).

The original complaint asserted breaches throughout the loan pool, described a

forensic review that revealed that almost 80% of sampled loans breached the

representations and warranties, and asserted that the loan originators "failed to adhere to

industry-standard and reasonable underwriting guidelines in an extremely high percentage

of cases." U.S. Bank averred that, "given these high breach rates, it is reasonable to infer

that breaches of DLJ's R&Ws exist throughout the entire pool of Mortgage Loans in the

Trust." Further, the complaint referenced the prefiling letters as notice of the breaching

loans that FHFA and U.S. Bank specifically identified. That notice alerted DLJ to an

alleged pattern of breaches of the representations and warranties, as well as the nature of

U.S. Bank's claims against DLJ and its demand that DLJ repurchase breaching loans, as

required by the PSA. U.S. Bank thus put DLJ on notice of transaction-wide errors and

breaches not limited to any individual loan. In other words, the complaint and the prefiling

letters put DLJ on notice of systemic breaches.[3] Therefore, the pleading placed DLJ on

notice "of the transactions, occurrences or series of transactions or occurrences, to be

proved pursuant to the amended pleading" (CPLR 203 [f]).

---

[3] CPLR 203 (f) does not require U.S. Bank to amend its complaint each and every time it identified a new breaching loan as it continued to comb through the systemic breaches present in the loan pool (*see* majority op at 15). It is immaterial that the expert report identified an additional 480 loans at issue, because the original notice was sufficient.

Contrary to DLJ's argument, each loan is not a separate transaction, nor are the claims about the later-discovered loans based on events that occurred post-filing. Rather, the loans at issue were part of the same loan pool, and securitized and governed by the same documents. As we previously held in *ACE Sec. Corp.* (25 NY3d at 598), any alleged breach occurred when the representations and warranties were made—i.e., at the time of execution—meaning that all alleged breaches occurred simultaneously. Indeed, many of the representations and warranties are based on standardized methods of loan review, and thus apply uniformly across the loan pool. For example, DLJ assured U.S. Bank that the mortgage loans "complie[d] with all the terms and requirements of the originator's underwriting standards in effect at the time of origination of" the loans; only a certain percentage of the loans in the pool were delinquent; all the loans in the pool "complied in all material respects with applicable local, state, and federal laws, including . . . all applicable predatory and abusive lending laws"; at the time of closing, all the loans would be "serviced" in accordance with the PSA; and the information regarding the loans set forth in the PSA was "complete, true, and correct in all material respects."

As U.S. Bank argues, its claims are based on a faulty securitization process that infected the entire trust and rendered the representations and warranties meaningless, as applied to the entire loan pool, the moment that the agreement was executed. Contrary to DLJ's argument, U.S. Bank does not allege any action by DLJ after execution or even after filing of the complaint that breached the representations and warranties.

Significantly, DLJ does not argue that allowing the later-noticed claims to relate back to the filing of the original complaint works prejudice on its defense; such an argument would be unpersuasive (*see Duffy v Horton Mem. Hosp.*, 66 NY2d 473, 476 [1985] [explainig that the primary purpose of a limitations period is "fairness to a defendant," who should be "secure in (the) reasonable expectation that the slate has been wiped clean of ancient obligations, and (the defendant) ought not to be called on to resist a claim where the evidence has been lost, memories have faded, and witnesses have disappeared"]). These later-discovered, allegedly breaching loans are part of the same RMBS as the loans referenced in the prefiling demand letters. Thus, DLJ is "likely to have collected and preserved available evidence relating to the entire transaction or occurrence and" their "sense of security" had "already been disturbed" when U.S. Bank filed suit (*Bloomfield v Bloomfield*, 97 NY2d 188, 193 [2001]).

In contrast, to require RMBS plaintiffs to supply notice of every breaching loan within the statute of limitations, which will likely have elapsed before discovery is completed, places plaintiffs in an untenable position not intended by the PSA. I find unpersuasive and hyperbolic DLJ's argument that allowing the claims to refer back to the original pleading would permit a certificateholder or trustee to wait until the last day of the statute of limitations to identify two loans and then seek relief for hundreds more after the statute of limitations expired. First, the statute of limitations is six years and U.S. Bank, like any claimant, has the entire period available to file suit. Second, if the two loans are examples of massive breaches and the representations and warranties are actually

referenced, that may indeed be sufficient to place DLJ on notice, but that would be a decision to be made on a case-by-case basis. Third, here, over 20% of the loan pool was identified as breaching, not less than one percent, as in DLJ's example.

Nothing in the PSA precludes relation back. The repurchase protocol was designed to make the trust and certificateholders whole in the event that DLJ breached the PSA's representations and warranties. It undermines that purpose for this Court to read the repurchase protocol's notice requirement as a strict bar to recovery, especially where U.S. Bank's complaint informed DLJ of the scope of its alleged liability (*Kass v Kass*, 91 NY2d 554, 567 [1998] ["Where the document makes clear the parties' over-all intention, courts examining isolated provisions should . . . choose that construction which will carry out the plain purpose and object of the agreement"] [internal quotation marks omitted]). Therefore, the majority's assertion that U.S. Bank is attempting to use CPLR 203 (f) as "a vehicle in the context of civil litigation to excuse noncompliance with other statutory pleading and statute of limitation requirements" is unsupported (*see* majority op at 15). There is no contractual prerequisite to suit that U.S. Bank failed to follow.

Nor does our decision in *U.S. Bank* change the analysis. First, in that case, the trustee filed its complaint after the six-year statute of limitations elapsed (*see* 33 NY3d at 79). Here, DLJ concedes that the original complaint was timely filed. Thus, U.S. Bank's claims of later-discovered breaching loans relate back to a timely filed "valid preexisting action." Second, in *U.S. Bank*, we rejected the argument that DLJ made, which it repeats here, that the trustee can seek relief only for loans noticed prior to the expiration of the statute of

limitations. As we explained, "RMBS notice and sole remedy provisions are not substantive elements of the cause of action, but instead limitations on the remedy for a breach of the mortgage loan representations and warranties. . . . They serve as a precondition, 'a procedural prerequisite to suit,' not a separate undertaking by the trustee" (*id.* at 80 [citations omitted], quoting *ACE Sec.*, 25 NY3d at 598). Although the issue arose in the context of a CPLR 205 (a) motion, the legal proposition upon which the decision rests applies independently of that procedural context and with equal force to a motion pursuant to CPLR 203 (f). Thus, contrary to the majority's conclusion (*see* majority op at 16), the repurchase protocol is not a substantive condition precedent to suit, and cannot bar the application of the relation-back doctrine on the facts of this case.

V.

DLJ's summary judgment motion was properly denied except with respect to U.S. Bank's claim for accrued interest on liquidated loans. Therefore I would modify the Appellate Division only on that specific issue and would otherwise affirm and answer the certified question in the negative.

The majority's interpretation leads to the anomalous result of shielding DLJ from remedying the most egregious and economically impactful breaches of the agreement. Put another way, because the majority concludes that DLJ should be deemed to be on notice only of specifically identified loans and not of the attendant effects of the alleged defect, DLJ may ignore hundreds of allegedly noncompliant loans that reveal significant breaches of the warranties and guarantees. This is not a proper interpretation of the agreement. It

could not have been the intent of the parties to provide a remedy for a few defective loans but allow for systemwide breaches affecting thousands of loans in the pool—allegedly 80% here—or to permit the sponsor to escape the contractual cure and repurchase obligations simply because DLJ was informed there was a significant problem with its securitization but not given the corresponding number for every loan it allegedly failed to properly vet. Further, nothing in the agreement prohibits U.S. Bank from seeking relief for loans identified during discovery in this litigation. Therefore, because the complaint set forth the transactions and occurrences underlying U.S. Bank's contract claims, those later identified loans relate back to the filing of the original complaint and may be considered in calculating the damages recoverable for DLJ's alleged breaches. I dissent from the majority's departure from our established contract principles and liberal application of the CPLR.

Order insofar as appealed from reversed, with costs, defendant's motion for partial summary judgment granted in accordance with the opinion herein and certified question answered in the negative. Opinion by Chief Judge DiFiore. Judges Garcia, Singas, Cannataro, Troutman and LaSalle concur. Judge Rivera dissents in part in an opinion. Judge Wilson took no part.

Decided March 17, 2022