Ambac Assur. Corp. v Countrywide Home Loans, Inc. (2018 NY Slip Op 04686)

Ambac Assur. Corp. v Countrywide Home Loans, Inc.

2018 NY Slip Op 04686 [31 NY3d 569]

June 27, 2018

Garcia, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, September 16, 2018

[*1]

Ambac Assurance Corporation et al., Appellants,
v
Countrywide Home Loans, Inc., et al., Respondents, and Bank of America Corp., Defendant.

Argued June 6, 2018; decided June 27, 2018

Ambac Assur. Corp. v Countrywide Home Loans, Inc., 151 AD3d 83, affirmed.

{**31 NY3d at 575} OPINION OF THE COURT

Garcia, J.

Plaintiff Ambac Assurance Corporation, a monoline financial guaranty insurer, agreed to insure payments of principal and interest owed to the holders of residential mortgage-backed securities sponsored by defendant Countrywide.[FN1] Following a market downturn, many of the loans backing those securities went into default, causing [*2]substantial losses. Ambac filed suit against Countrywide, alleging, among other things, that Countrywide fraudulently induced Ambac to enter into the insurance agreements and that Countrywide breached a number of contractual representations and warranties. Both parties brought motions for partial summary judgment. As relevant here, Ambac argued that, with respect to its fraudulent inducement claim, it did not need to prove justifiable reliance or loss causation, and that the proper measure of damages would be recovery of all claims paid out under the policies. Ambac also asserted that the repurchase protocol provided for as a sole damages remedy in the contract between the parties should not govern certain of its contractual claims. Lastly, Ambac sought attorneys' fees from Countrywide. We agree with the Appellate Division that these arguments lack merit and therefore affirm.
I.
The residential mortgage-backed securities (RMBS) market was a booming industry in the mid-2000s. These "intricately structured financial instruments [are] backed by hundreds or thousands of individual . . . mortgages, each obtained by individual borrowers for individual houses" (Federal Housing Fin. Agency v Nomura Holding Am., Inc., 104 F Supp 3d 441, 458 [SD NY 2015], affd 873 F3d 85 [2d Cir 2017]). The investor in this type of security is entitled to "a stream of income from pools of residential mortgage loans held by a trust" (id.). Between 2004 and 2006, Ambac insured 17 RMBS securitizations issued by Countrywide. These securitizations were backed by more than 300,000 individual mortgage loans, which Countrywide{**31 NY3d at 576} had originated or acquired and then sold into securitization trusts. In exchange for substantial premiums, Ambac issued unconditional, irrevocable insurance policies, agreeing to insure certain payments to the investors. Securities with a guaranty of payment from a monoline insurer typically receive the credit rating of that insurer. In this case, the guaranty by Ambac, itself rated AAA, significantly enhanced the credit ratings of the RMBS securitizations.
For each securitization, Ambac executed an insurance and indemnity agreement (Insurance Agreement)—the only contract between the parties here—setting out Ambac's insurance obligations. Section 2.01 (l) of the Insurance Agreement incorporates more than 60 representations and warranties from the agreements executed by Countrywide to effect each of the securitization transactions.[FN2] These representations and warranties address a range of issues, including each mortgage loan's compliance with underwriting guidelines, the accuracy of the information in the mortgage loan schedule, appraisal and foreclosure issues, and compliance with federal regulations.
Section 2.01 (l) also provides that the remedy for breach of any of these imported representations and warranties and the remedy "with respect to any defective Mortgage Loan or any Mortgage Loan as to which there has been a breach of representation or warranty" under the Securitization Documents "shall be limited to the remedies specified" in the applicable Securitization Documents. In turn, the limited remedy provided in the Securitization Documents requires Countrywide to either repurchase, cure, or substitute nonconforming loans. Other subdivisions of section 2.01 contain additional representations and warranties, including that there are no material untrue statements in the Insurance Agreement, Securitization Documents, or other material written or electronic information provided to Ambac relating to the mortgage loans or Countrywide's operations or financial condition (§ 2.01 [j]), and that the transactions' offering documents did not contain{**31 NY3d at 577} any material misrepresentation or omission and otherwise complied with applicable securities laws (§ 2.01 [k]).
[*3]Section 3.03 (c) of the Insurance Agreements provides that Countrywide agrees to reimburse Ambac for "charges, fees, costs and expenses . . . including reasonable attorneys' . . . fees and expenses, in connection with . . . the enforcement, defense or preservation of any rights in respect of any of the Operative Documents, including defending, monitoring or participating in any litigation or proceeding . . . relating to any of the Operative Documents." Section 5.02 (b) of the Insurance Agreements provides that, "[u]nless otherwise expressly provided, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Insurance Agreement . . . or existing at law or in equity."
By 2007, with the housing market in decline, mortgage default and delinquency rates increased (see Federal Housing Fin. Agency, 873 F3d at 106-107). As a result, Ambac had to pay out far more claims than anticipated. At this point, the complaint alleges, Ambac began to review the origination files of defaulting loans and found that approximately 7,900 out of 8,800 that were reviewed contained material breaches of the Insurance Agreements' representations and warranties. Ambac then initiated the repurchase protocol by submitting notices of breach to Countrywide.
In September 2010, Ambac commenced the instant action, alleging that Countrywide "fraudulently induced Ambac to provide . . . credit enhancement to improve the marketability of the notes and certificates issued in connection with each of the [RMBS securitizations]." In addition, Ambac alleged material breach of each Insurance Agreement; breach of the representations and warranties between the parties; breach of the repurchase protocol; and indemnification and reimbursement of attorneys' fees and expenses. Ambac also included a claim of successor and vicarious liability against Bank of America.
Both parties moved for partial summary judgment. As relevant to this appeal, Supreme Court determined, relying on Insurance Law § 3105, that Ambac did not need to demonstrate justifiable reliance and loss causation in order to succeed on its fraudulent inducement claim. With respect to Ambac's claims alleging breaches of the various contractual representations{**31 NY3d at 578} and warranties, the court found that the sole remedy provision did not apply "beyond Section 2.01(l)," so "to the extent that Ambac can prove breaches of other sections of the I[nsurance] Agreements, it is not limited to the sole remedy of repurchase" (2015 NY Slip Op 32703[U], *9 [2015]). However, the court determined that, "to the extent that Ambac is entitled to receive an award of damages unrelated to the repurchase protocol," Ambac was not entitled to recover all payments made to investors pursuant to the Insurance Agreements as compensatory damages because that would be "effectively equivalent to rescissory damages," and that any damages calculation "must be calculated in reference to claims payments made due to loans breaching" representations and warranties (2015 NY Slip Op 32703[U], *21, *23). Finally, the court found that Ambac was not entitled to recover attorneys' fees.
On appeal, the Appellate Division modified Supreme Court's opinion in part and affirmed (Ambac Assur. Corp. v Countrywide Home Loans, Inc., 151 AD3d 83 [1st Dept 2017]). The Appellate Division held that justifiable reliance and loss causation are required elements of a fraudulent inducement claim, and that Insurance Law § 3105 is not applicable to a common-law fraud claim for money damages. The Appellate Division rejected Supreme Court's holding that the repurchase protocol was not the sole remedy for Ambac's claims for breach of representations and warranties, holding instead that "Ambac cannot avoid the consequences of the sole remedy provision by relying on what it terms 'transaction-level' representations about Countrywide's operations and financial condition, because the heart of Ambac's lawsuit is that it was injured due to a large number of defective loans" (151 AD3d at 89). The Appellate Division affirmed Supreme Court's method of damages calculation for any claims not subject to the repurchase protocol, holding that Ambac was not entitled to compensatory damages "amounting to all claims payments it made or will make under the policies, regardless of whether they arise from a breach or misrepresentation" (id. at 88). Finally, the Appellate Division affirmed Supreme Court's holding that Ambac was not entitled to attorneys' fees. The Appellate Division granted Ambac leave to appeal.
II.
The required elements of a common-law fraud claim are "a misrepresentation or a material omission of fact which was{**31 NY3d at 579} false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury" (Pasternack v Laboratory Corp. of Am. Holdings, 27 NY3d 817, 827 [2016] [citations and internal quotation marks omitted]). Justifiable reliance is a "fundamental precept" of a fraud cause of action (Danann Realty Corp. v Harris, 5 NY2d 317, 322 [1959]), as is "resulting injury" (Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V., 17 NY3d 269, 276 [2011]). This Court has previously held, in the context of a monoline insurer suing for fraudulent inducement of a financial guaranty on a transaction involving asset-backed securities, that "to plead a claim for fraud in the inducement or fraudulent concealment, plaintiff must allege facts to support the claim that it justifiably relied on the alleged misrepresentations" (ACA Fin. Guar. Corp. v Goldman, Sachs & Co., 25 NY3d 1043, 1044 [2015]; see also id. at 1051 [Read, J., dissenting on other grounds] [describing the justifiable reliance requirement as "our venerable rule"]). In apparent recognition of the fact that justifiable reliance and loss causation are required elements of its fraudulent inducement claim, Ambac's operative complaint pleaded these well-established elements, alleging that Ambac "reasonably relied on Countrywide's statements and omissions when it entered into the . . . Agreements and issued its Policies," and that "[a]s a result of Countrywide's false and misleading statements and omissions, [Ambac] suffered, and will continue to suffer, damages including claims payments under the Policies." Nevertheless, Ambac argues it need not make the showing required to substantiate these allegations.
Supreme Court relied on Insurance Law § 3105 in addressing Ambac's claim that it need not show justifiable reliance or loss causation. Distinguishing this Court's holding in ACA Fin. because "the parties [in that case] did not raise the issue of New York Insurance Law § 3105, under which Ambac seeks recovery here," Supreme Court held that "the only 'pertinent question under Section 3105 is whether the information allegedly misrepresented by Countrywide induced [Ambac] to take action that it might otherwise not have taken,' " or, in other words, whether the misrepresentation was "material" (2015 NY Slip Op 32703[U], *6). This was error.
Insurance Law § 3105 plays no role here. Ambac did not, and could not, seek recovery under this section, nor does{**31 NY3d at 580} section 3105 function to relieve Ambac of the burden of showing justifiable reliance. Section 3105 (b) (1) provides that "[n]o misrepresentation shall avoid any contract of insurance or defeat recovery thereunder unless such misrepresentation was material," and "[n]o misrepresentation shall be deemed material unless knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make such contract." Section 3105 does not provide an affirmative, freestanding, fraud-based cause of action through which an insurer may seek to recover money damages. Nor does it "inform" a court's assessment of the longstanding common-law elements of fraudulent inducement. By its terms, section 3105 is only relevant when an insurer seeks rescission of an insurance contract or is defending against claims for payment under an insurance contract, relief that Ambac cannot, and does not, seek.
Moreover, section 3105 was intended to overrule prior case law which did not require a showing of materiality for an insurer to avoid its obligations under a policy based on the insured's misrepresentations (see Glickman v New York Life Ins. Co., 291 NY 45, 51 [1943] [noting with respect to section 3105's predecessor statute, "(a)pparently . . . the Legislature was seeing to it that a policy of insurance will not be avoided by proof of an immaterial breach of warranty" (internal quotation marks omitted)]). Section 3105, intended to benefit the insured party, does not remove required elements for a showing of common-law fraudulent inducement under any "insurer-only" exception.
Public policy reasons support the justifiable reliance requirement. Where a "sophisticated business person or entity . . . claims to have been taken in," the justifiable reliance rule "serves to rid the court of cases in which the claim of reliance is likely to be hypocritical" (DDJ Mgt., LLC v Rhone Group L.L.C., 15 NY3d 147, 154 [2010]). Excusing a sophisticated party such as a monoline financial guaranty insurer from demonstrating justifiable reliance would not further the policy underlying this "venerable rule."
Likewise, there is no merit to Ambac's argument that it need not show loss causation. Loss causation is a well-established requirement of a common-law fraudulent inducement claim for damages. This Court long ago noted that "[t]o give rise, under any circumstances, to a cause of action, either in law or in equity, reliance on the false representation must result in{**31 NY3d at 581} injury" (Sager v Friedman, 270 NY 472, 479-481 [1936]). This Court recently affirmed this requirement, as well as the principle that, " '[i]f the fraud causes no loss, then the plaintiff has suffered no damages' " (Connaughton v Chipotle Mexican Grill, Inc., 29 NY3d 137, 142 [2017], citing Sager, 270 NY at 479-481). It applies with equal force to Ambac's claim.
[*4] With respect to the method of damages calculation for any claims not subject to the repurchase protocol, Ambac's request for compensatory damages in the form of all claims payments made to investors must be rejected.[FN3] Ambac has, admittedly, no right to rescission or rescissory damages on the unconditional, irrevocable insurance policies it issued. Yet Ambac seeks to recover claims payments on all policies, even those that do not arise from a breach or misrepresentation. Payment of that measure of damages would place Ambac in the same position it would be in if it had not insured any of the securities—the equivalent of rescissory damages. Instead, any compensatory damages should be measured only by reference to claims payments made based on nonconforming loans.
III.
Once again, as in our recent decision in Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc., we are confronted with an argument that a sole remedy provision executed by sophisticated parties as part of a complex securitization process can be avoided by alleging "broader" or numerous violations of representations and warranties contained in the governing contract (30 NY3d 572, 585-586 [2017]). Specifically, Ambac asserts that, while recovery for "loan-level" breaches may be limited to the repurchase protocol in section 2.01 (l), "transaction-level" breaches instead fall under section 2.01 (j) and (k). For the same reasons we rejected that argument in Nomura, Ambac's argument must fail.
It is well settled that "courts must honor contractual provisions that limit liability or damages because those provisions represent the parties' agreement on the allocation of the risk of economic loss in certain eventualities" (id. at 581). "Contract terms providing for a sole remedy are sufficiently clear to establish that no other remedy was contemplated by the parties{**31 NY3d at 582} at the time the contract was formed, for purposes of that portion of the transaction . . . especially when entered into at arm's length by sophisticated contracting parties" (id. at 582 [citations and internal quotation marks omitted]).
In Nomura, plaintiff, an RMBS trustee, sought to avoid a sole remedy repurchase protocol by alleging that, although loan-level representations and warranties were breached, and were subject to a similar sole remedy provision, certain transaction-level breaches violated a separate section of the agreement that were not subject to any limitation on remedy. This Court rejected that argument, stating that "there is no support in the governing agreements for the position of [plaintiff] that the Sole Remedy Provision applies only to occasional mortgage loan-specific breaches, whereas pervasive (or 'aggregate') breaches are addressed under" a separate provision not limited by the sole remedy provision (id. at 585). The Court noted that all the claims asserted as transaction-level breaches not subject to the sole remedy provision were in fact "grounded in alleged breaches of the mortgage loan-specific representations and warranties to which the limited remedy fashioned by the sophisticated parties applies" (id. at 577). Accordingly, the Court held that the sole remedy provision could not be "nullif[ied by allegations of] multiple, systemic breaches" (id. at 585-586).
 In the same way, the factual allegations underpinning Ambac's transaction-level breaches are the same as those for the loan-level breaches. For example, Ambac alleges as a transaction-level breach that the loans in the securitizations failed Countrywide's origination guidelines. Yet one of the loan-level representations and warranties incorporated into the Insurance Agreements provides that "each Mortgage Loan was originated in accordance with [Countrywide's] underwriting guidelines." This allegation, if proved, would violate the loan-level representations and warranties under section 2.01 (l) and so any damages would be limited to the sole remedy repurchase protocol. This is true as to all of Ambac's transaction-level allegations, despite the attempt to label the claims otherwise. As in Nomura, plaintiff here "cannot subvert [an] exclusive remedies [provision] by simply re-characterizing its claims" (id. at 584 [citation and internal quotation marks omitted]).
In fact, the sole remedy provision contracted for by the parties is arguably broader than the one at issue in Nomura, which provided that the repurchase protocol was the sole remedy for{**31 NY3d at 583} the "Purchaser against [defendant] [*5]respecting a missing document or a breach of the representations and warranties" contained in the governing contract (id. at 579-580). The contract here provides that the repurchase protocol is the sole remedy "for any breach of a representation and warranty [incorporated into the Insurance Agreements] and the remedy with respect to any defective Mortgage Loan or any Mortgage Loan as to which there has been a breach of representation or warranty under" the relevant section of the Securitization Documents (emphasis added). In addition to encompassing any breaches of the representations and warranties, the repurchase protocol is the sole recourse as to any defective loan—regardless of whether that defect is a breach of "loan-level" representations made to investors.[FN4]
Ambac's assertion that section 5.02 (b) somehow overrides section 2.01 (l)'s limitation on remedies is unavailing for the same reasons we rejected a similar argument in Nomura. Section 5.02 (b) provides that contractual remedies are cumulative "[u]nless otherwise expressly provided"; section 2.01 (l) expressly provides otherwise for breaches of that section, making the repurchase remedy exclusive for recovery on Ambac's breach of contract claims. The Court in Nomura held that a cumulative remedy provision, even without "unless otherwise expressly provided" language, did not override the sole remedy provision. We noted that plaintiff's argument to the contrary in that case would render the sole remedy provision meaningless even for disputes that would have fallen squarely under the representations section of the relevant purchase agreement (id. at 586). And, in general, " '[a] specific provision will not be set aside in favor of a catchall clause' " (id., quoting William Higgins & Sons v State of New York, 20 NY2d 425, 428 [1967]). Here, the broader language in the cumulative remedy provision explicitly referencing any limitations in other provisions makes it even clearer that the cumulative remedy provision is not controlling.
Ambac's complaint fails to include breach of contract allegations beyond those that fall under the sole remedy provision of{**31 NY3d at 584} section 2.01 (l), and accordingly Ambac is limited to the repurchase protocol as the potential remedy for those claims.[FN5]
IV.
Ambac argues that the Appellate Division erred in ruling that the parties' contract "does not evince an 'unmistakably clear' intent to permit Ambac to seek reimbursement for attorneys' fees incurred in its litigation against Countrywide" (151 AD3d at 89). We disagree.
In New York, "the prevailing litigant ordinarily cannot collect . . . attorneys' fees from its unsuccessful opponents. . . . Attorneys' fees are treated as incidents of litigation, rather than damages. . . . The exception is when an award is authorized by agreement between the parties or by statute or court rule" (Congel v Malfitano, 31 NY3d 272, 290-291 [2018] [citations and internal quotation marks omitted]). In Hooper Assoc. v AGS Computers, this Court held that a court "should not infer a party's intention to waive the benefit of the rule [*6]unless the intention to do so is unmistakably clear from the language of the promise" (74 NY2d 489, 492 [1989]). Here, as in Hooper, the attorneys' fees provision "does not contain language clearly permitting plaintiff to recover from defendant the attorney[s'] fees incurred in a suit against defendant" (id. at 492). Similarly, the subjects set forth in this provision are all "susceptible to third-party claims," and "[n]one are exclusively or unequivocally referable to claims between the parties themselves" (id. at 492). Accordingly, there is no unmistakable promise to reimburse attorneys' fees in a case brought by Ambac against Countrywide.
V.
The Appellate Division correctly determined that justifiable reliance and loss causation are required elements of a fraudulent inducement claim; that Ambac may only recover damages on its fraudulent inducement claim that flow from nonconforming loans; that the remedy for Ambac's contract claims is limited to the repurchase protocol provided for in the contract's{**31 NY3d at 585} sole remedy provision, and that Ambac is not entitled to attorneys' fees.
The order, insofar as appealed from, should be affirmed, with costs, and the certified question answered in the affirmative.

Rivera, J. (dissenting in part). I join the majority's opinion with respect to parts I, II, and IV. For the reasons set forth in my dissent in Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc. (30 NY3d 572 [2017]), I disagree that Ambac's remedies are limited to the repurchase protocol, and therefore do not join part III of the majority opinion. As in Nomura, it is here "undisputed" that "where there is a breach of the representations and warranties [R&Ws] . . . concerning an individual mortgage loan, [Ambac] is limited to the sole remedy" of the repurchase protocol (id. at 600 [Rivera, J., dissenting]). "Yet," here just as in Nomura, "that remedy is not exclusive of other available remedies for different breaches of the . . . agreement" (id.). In particular, in this case,
"[p]laintiff's allegations of transaction-wide misrepresentations concerning the respective loan pools are not mere duplicative recitations of breaches of [the R&Ws]. Instead, [some of] plaintiff's . . . claims concern [inter alia] defendant's characterizations, through its statements and documentation, of the securitizations as suitable investment opportunities, the reliability of defendant's business practices, and the nature and quality overall of the loan pools" (id. at 602).
[*7]The alleged mischaracterizations are beyond the realm of mere R&W violations controlled by the sole remedy provision. I would therefore hold that Ambac is not limited to the sole remedy of the repurchase protocol.
Judges Stein, Fahey, Wilson and Feinman concur; Judge Rivera dissents in part in an opinion; Chief Judge DiFiore taking no part.
Order, insofar as appealed from, affirmed, with costs, and certified question answered in the affirmative.

Footnotes

Footnote 1:Plaintiffs in this action are Ambac Assurance Corporation and the Segregated Account of Ambac Assurance Corporation, a segregated account in statutory rehabilitation with the legal capacity and authority to sue in its own right (collectively, Ambac). Defendants in this action include Countrywide Home Loans, Inc., Countrywide Securities Corp., and Countrywide Financial Corp. (collectively, Countrywide). Countrywide is now a subsidiary of defendant Bank of America Corp.

Footnote 2:The underlying agreements vary by type of transaction. The principal governing documents for certain transactions are the mortgage loan purchase agreement (Purchase Agreement) and the sale and servicing agreement (Sales Agreement), while other types of transactions are governed by the pooling and service agreement (PSA). The representations in these documents (collectively, the Securitization Documents), as relevant here, are identical.

Footnote 3:As discussed in section III below, Ambac's remedy for any successful breach of contract claims based on the representations and warranties in the Insurance Agreement is limited to the repurchase protocol.

Footnote 4:Prior to filing this lawsuit, Ambac attempted to avail itself of this remedy by submitting nearly 8,000 loans to Countrywide pursuant to the protocol. Unsatisfied with that process, Ambac included a cause of action in this lawsuit for breach of Countrywide's "repurchase, cure, or substitution obligation."

Footnote 5:Countrywide acknowledges that Ambac would not be limited to the repurchase remedy for breach of contract claims unrelated to representations pertaining to specific loan characteristics. For example, Ambac could bring claims alleging misstatements in the transactions' offering documents concerning overcollateralization provisions, or descriptions of RMBS certificates, which would fall under section 2.01 (k) (see Nomura, 30 NY3d at 586).