Offshore Exploration & Prod., LLC v De Jong Capital, LLC (2023 NY Slip Op 50502(U))

[*1]

Offshore Exploration & Prod., LLC v De Jong Capital, LLC

2023 NY Slip Op 50502(U)

Decided on May 24, 2023

Supreme Court, New York County

Reed, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 24, 2023
Supreme Court, New York County

Offshore Exploration and Production, LLC, Plaintiff,

against
De Jong Capital, LLC, Defendant.

Index No. 653659/2021

Robert R. Reed, J.

The following e-filed documents, listed by NYSCEF document number (Motion 002) 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 75, 89, 95 were read on this motion to DISMISS.
Plaintiff Offshore Exploration and Development (OEP) alleges that it and defendant De Jong Capital, LLC (DJC) formed a partnership to purchase and operate an oil and gas business in Peru. Plaintiff asserts that defendant unlawfully usurped the partnership's opportunity to acquire the business, in order to use plaintiff's proprietary information to purchase the business on its own. Defendant moves to dismiss the complaint pursuant to CPLR 3211. Defendant contends that a partnership did not exist as the parties never agreed on the final terms of a partnership agreement. 
 I. Allegations in the Complaint
Unless otherwise indicated, these events took place in 2020. Each party is incorporated in Delaware and has a principal place of business in Houston, Texas. Throughout the parties' dealings, Brent De Jong acted as defendant DJC's principal and Brent Kallop did the same for plaintiff OEP. 
In 2009, plaintiff sold nonparty Offshore International Group (OIG) to the national oil companies of Colombia and South Korea. One of the sales terms was that $150 million of the $1.3 billion purchase price would be held in escrow for the purpose of settling post-closing indemnity obligations potentially owed by plaintiff. Plaintiff was to receive any amounts remaining in the escrow account after resolution of the indemnity obligations. At the time that this complaint was filed, $36.5 million remained in the escrow account. 
In 2014, plaintiff learned that OIG was for sale and began planning to repurchase it, a process that included research and discussions with potential investors, including defendant. In 2016, the parties began discussing the possibility of together buying OIG. Plaintiff considered offering defendant "an equity interest in a joint venture in exchange for . . . entering the sale process on behalf of a partnership between" the parties (NYSCEF 20, complaint, ¶ 20). Defendant had no material knowledge or understanding of OIG's operations or potential. [*2]Plaintiff "walked De Jong through the basics" of OIG (id., ¶ 22). The parties agreed that defendant would request admission to the sales process "on behalf of the partnership" (id., ¶ 26). OIG's agent admitted defendant to the sales process in August 2020, and defendant relied heavily on the information provided by plaintiff to navigate the sales process. Potential buyers of OIG were allowed to gain access to confidential information about its operations via a virtual data room. Defendant executed a confidentiality agreement which enabled access to the virtual data. Defendant and plaintiff then drafted their own confidentiality agreement. 
The parties agreed that they would form a partnership with a 90/10 equity split. The larger part belonged to plaintiff, because its proprietary knowledge of OIG would be the principal asset of the partnership and it was providing the capital. Defendant "would not contribute capital, but instead earned its 10% equity stake by spearheading the bidding process" (NYSCEF 20, ¶ 35). Defendant said that it would not do the deal without plaintiff. "This statement was a key milestone in the De Jong-OEP partnership, giving OEP the assurance that De Jong would not circumvent OEP and inducing OEP to share additional valuable confidential information for the benefit of the partnership. Relying on that promise, OEP shared with De Jong extensive analyses of [OIG]'s business activity and invaluable proprietary, nonpublic information" (id., ¶ 37). 
In September, defendant began secret efforts to augment its equity by falsely representing to plaintiff that, under the terms of defendant's confidentiality agreement with OIG, plaintiff and defendant had to be 50/50 partners for defendant to share information from the virtual data room with plaintiff. Plaintiff rejected the suggestion of an equal partnership. Plaintiff learned that defendant had misrepresented OIG's confidentiality agreement, which allowed information to be shared with plaintiff without a 50/50 partnership. Plaintiff became "wary of sharing" information with defendant and stopped sharing information and analysis, "for a time" (NYSCEF 20, ¶ 42). 
Plaintiff gained admission to the sales process and obtained access to OIG's virtual data room. Defendant "struggled to understand both the opportunity and the mechanics of the business without [plaintiff]'s further assistance, causing the deal to stall" (NYSCEF 20, ¶ 44). Eventually, OIG's agent notified defendant that its participation in the sales process was terminated and requested that defendant delete all files downloaded from the virtual data room. "Instead of deleting the files, DJC concocted a story in an attempt to utilize OEP's proprietary information to revive efforts to acquire the business" (id., ¶ 45). Defendant told the agent that it would be willing to complete the transaction if the escrow account could be assigned to defendant. As the escrow account was plaintiff's property, it could only be assigned to defendant if the parties were in a partnership. 
Plaintiff expressed concern to defendant that the latter had made an unauthorized proposal about the escrow to OIG's agent. Defendant again assured plaintiff that it would not buy OIG without plaintiff and countersigned the parties' confidentiality agreement. The agreement is dated September 15. 
In November, the sales process opened for nonbinding proposals to buy OIG and the parties drew up a nonbinding offer. Plaintiff's input included substantial proprietary information about OIG. On November 19, defendant submitted the nonbinding offer to OIG's agent on behalf of the partnership. Plaintiff also drafted a nonbinding offer and submitted the offer on behalf of the partnership. Defendant said to plaintiff that they had a verbal agreement to work as partners, and they worked together on finalizing a partnership agreement. 
OIG's agent invited the parties to submit binding offers. In reliance on defendant's assertion that they were partners, plaintiff continued to share its extensive analysis of OIG to draft the binding offer. 
On November 30, the deadline for submitting binding offers, shortly after 2 p.m., defendant sent plaintiff an outline of possible offers. Plaintiff expressed reservations and the parties agreed to talk later in the day. At 6:30 p.m., during an online meeting, defendant presented plaintiff an unauthorized bid structure with alternate proposals. One proposal reflected the deal that the parties had worked on together. The other proposal did not reflect the deal that the parties had worked on together and involved the possibility of a third-party investor. Defendant promised to call back shortly after reviewing the final draft of the partnership agreement sent by plaintiff. Defendant did not call back or answer plaintiff's messages. 
November 30, at 9:19 p.m., defendant emailed plaintiff that defendant had submitted the unauthorized offer and that, if OIG accepted the offer, the partnership documentation would only need to be "tweaked." Plaintiff was "alarmed" by the change of plans and defendant's failure to respond to text messages the previous day. To protect its own interests, plaintiff submitted a binding offer the same night. This offer reflected the offer that the "partnership had worked on together." Plaintiff submitted this bid fully intending to honor its partnership with defendant if the offer were accepted. Later that night, defendant sent plaintiff the partnership agreement with some "minor edits." 
On December 4, plaintiff called defendant and offered additional financial support for the purchase of OIG in the form of collateral security from a plaintiff affiliate in Peru. In mid-December, plaintiff asked defendant about any feedback from OIG, but defendant did not tell of any developments. In late December, at OIG's agent's request, plaintiff submitted a revised binding offer fully intending to honor the partnership if it were accepted. 
Although the partnership agreement was not signed, all material terms had already been negotiated and agreed to. Defendant expressly asserted that the parties had a "verbal deal," and stated in writing (before and after the submission of binding offers) that the parties had a 90/10 split. In January 2021, OIG announced that defendant had purchased it. Defendant revealed that it had found a new partner, who had put in the capital for the purchase. Defendant admitted that it had told plaintiff that it would not do the deal without plaintiff and that it used plaintiff's confidential information to bring the transaction with its new partner to fruition. 

 II. The Partnership Agreement
The parties never signed the partnership agreement that they drafted. The parties exchanged ten drafts of the "Collaboration and Interim Investors Agreement," the title for all the drafts. The parties' emails variously referred to the agreement as a partnership agreement or a JV agreement. "Partnership" and "joint venture" do not appear in any of the agreements. 
It seems that the first version was drafted by De Jong who sent it to plaintiff on November 14. Each party made material amendments to the agreements. Plaintiff's attorney revised the last draft, which plaintiff sent to defendant on December 3 (NYSCEF 49). No more agreements were exchanged. 
The agreements provide that the parties are contemplating the acquisition of OIG, and that they wish to agree on terms that will govern their relationship with respect to the sales process and BidCo, the name identifying a future limited liability company which defendant will form in Delaware and which will own OIG. OEP will own 90% of BidCo and DJC 10%. The [*3]agreements contemplate a future limited liability agreement governing BidCo. BidCo was never formed. 
The parties' numerous email messages and draft agreements show that they disagreed on defendant's compensation, whether to add a third partner or a third investor who would not be a partner, and whether defendant could raise funds to buy OIG. At various times, each party's emails to the other referred to the necessity of signing or finalizing the agreement and whether OIG would allow them to purchase it as partners. 
These are some examples of the parties' changes to the agreements. Defendant gave itself $2 million as compensation, which plaintiff reduced to $1.5 million. Defendant's November 19 email stated, "I am ok with the language . . . Do you want to sign first or me? I would appreciate it if you could give it one last consideration to increase the cap. DJC is bringing a unique 20 year skill set/track record . . . and clearly helping create the investment opportunity here" (NYSCEF 41). Plaintiff wrote back, "I am not prepared to go any higher on the cap . . . I am at least a little concerned about signing our agreement until we have been authorized to partner up. If our partnership is not formally permitted, we may want to teak [sic] the agreement" (id.). 
The agreement had provided that any excess remaining in the escrow after the purchase would be paid 50% to each party, up to a cap of $3 million to defendant. Plaintiff's November 30 email shows that its attorney eliminated this provision (NYSCEF 44). 
The December 1 email by defendant shows that it deleted the provision that, before closing, BidCo shall not solicit additional equity capital for the transaction or dilute the ownership of BidCo unless by mutual agreement by the parties. Defendant added a provision that it "will be retained to raise additional funds for Bidco above those contemplated . . . necessary to consummate the Transaction. BidCo will pay Mr. de Jong a fee of 4% of the amounts raised within 3 months of the date hereof" (NYSCEF 47, ¶ 1 [i], [k]). To the provision that the parties would "cooperate in good faith to help ensure the success of the Transaction," defendant added that they would also contemplate alternative proposals (id., ¶ 3 [a]). 
The December 3 email by plaintiff shows that its attorney added provisions that upon closing or earlier, as determined by plaintiff, plaintiff may allocate up to 5% of its equity to a local partner at its choosing; "contemporaneous therewith," BidCo and the parties will execute a limited liability agreement that reflects the addition of the new partner, whose share shall come from OEP's 90% (NYSCEF 49, ¶ 1 [g]); and if the seller did not accept the proposal or the closing did not occur, defendant would not be entitled to any compensation or equity under the agreement (id., ¶ 1 [k]). The provision that de Jong would be retained and would receive a 4% fee was deleted. 
The last draft, sent by plaintiff on December 3 provides that, upon closing of the purchase of OIG, OEP shall be issued 90% interest and DJC shall be issued 10% "interest in consideration for its services conducted pursuant to this Agreement for the benefit of Bidco." $1.5 million shall be released to DJC as "compensation for its services conducted under this Agreement." BidCo will be a manager-managed limited liability company, and OEP will be designated as BidCo's initial "Managing Member." Bidco's day to day management shall be handled by a management team designated by the Managing Member. Brent Kallop will be the initial President and CEO of BidCo. DJC's voting rights will be proportionate to its 10% interest. Should DJC wish to sell its interest in Bidco, OEP will have a right of first refusal to purchase DJC's shares. "DJC shall have customary preemptive rights and tag-along sale rights, [*4]to be negotiated in good faith by DJC and OEP." In all other respects, the form of the LLC Agreement shall be determined by OEP in its sole good faith discretion (NYSCEF 49, ¶ 1 [g]). Bidco or DJC may not make a proposal to OIG with respect to the transaction or discuss with it a proposal regarding a transaction on any terms other than the terms of the proposal or the terms of a nonconforming proposal that has been approved by OEP. Nonconforming proposals are those not conforming to the terms of the agreement. OEP reserves the right to grant a conditional approval for BidCo and DJC to make a nonconforming proposal to OIG. OEP may withdraw or cancel the conditional approval at any time for any reason at its sole discretion. Should the sellers reject the proposal or refuse to close the transaction, plaintiff in its sole discretion may terminate this agreement (NYSCEF 49, ¶ ¶ 1 [a]-[i]). If the closing does not occur, BidCo and DJC will not be entitled to any compensation (id., ¶ 1 [i], [k]). DJC and De Jong shall not pursue or engage in any discussions or negotiations regarding any other transaction with the sellers or any party (id., ¶ 3 [b]). 
Choice of law and choice of forum was set in Delaware, and the agreement includes disclaimer of reliance and merger clauses (NYSCEF 49, ¶ ¶ 4, 11, 12). The agreement provides: "This Agreement will become effective when all parties have signed it. The date this Agreement is signed by the last party to sign it (as indicated by the date associated with that party's signature) will be deemed the date of this agreement" (NYSCEF 49, ¶ 15). Signature blocks follow, with the names of Kallop, De Jong, and their respective companies. 
While the agreement provides that if BidCo is not formed by the time that the final proposal is submitted to OIG, DJC may submit the proposal on behalf of BidCo, the proposals in the record were not made on behalf of BidCo or a partnership. Each party submitted proposals under its own name and on its own letterhead. 
On November 19, defendant submitted a non-binding proposal. It states that "if permitted to partner with OEP, we believe that we can make a significant payment" on OIG's shareholder loans using OEP's escrow and "we would like to incorporate OEP into the Purchase Co for the Transaction" (NYSCEF 39). On November 30, plaintiff submitted a binding offer. "Either OEP, or an entity wholly owned and controlled by OEP, would be the Purchaser." A request was included that OIG permit the parties to partner (NYSCEF 43). Another binding offer on the same date makes the same request (NYSCEF 69). 

III. Legal Standard
On a motion to dismiss pursuant to CPLR 3211 (a) (7), the court accepts as true the facts as alleged in the complaint, accords the plaintiff the benefit of every possible favorable inference, and determines only whether the facts as alleged manifest any cognizable legal theory (Sokoloff v Harriman Estates Dev. Corp., 96 NY2d 409, 414 [2001]; Richbell Info. Servs. v Jupiter Partners, 309 AD2d 288, 289 [1st Dept 2003]). Notwithstanding this broad standard, dismissal will eventuate if the complaint fails to allege facts that support an element of the claim or that do not allow for the right of recovery (Connaughton v Chipotle Mexican Grill, Inc., 29 NY3d 137, 142 [2017]). 
Evidentiary material submitted by the defendant may serve to assess the viability of a complaint pursuant to CPLR 3211 (a) (7) (Basis Yield Alpha Fund (Master) v Goldman Sachs Group, Inc., 115 AD3d 128, 134 [1st Dept 2014]). Where extrinsic evidence shows that the complaint does not include a material allegation necessary to support the cause of action, dismissal will eventuate, even where the claim is a "well-pleaded cognizable claim" (id.). Extrinsic evidence on a 3211 (a) (7) motion is used to determine whether the plaintiff has a cause [*5]of action, not whether it has stated one (id. at 135; Bishop v Maurer, 33 AD3d 497, 498 [1st Dept 2006], affd 9 NY3d 910 [2007]). "Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]). 
A motion to dismiss based upon documentary evidence pursuant to CPLR 3211 (a) (1) should be granted only "where the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law" (Goshen v Mutual Life Ins. Co. of NY, 98 NY2d 314, 326 [2002] [internal citation and quotation marks omitted]). 
Defendant claims that the parties' emails utterly refute the allegations in the complaint. While email communications between the parties can qualify as documentary evidence (Kaplan v Conway & Conway, 173 AD3d 452, 453 [1st Dept 2019]; Amsterdam Hospitality Group, LLC v Marshall-Alan Assocs., Inc., 120 AD3d 431, 432 [1st Dept 2014]), in this case, the emails do not utterly refute plaintiff's allegations. 

IV. Breach of the Confidentiality Agreement
The first cause of action in the complaint alleges that defendant breached the parties' confidentiality agreement, entitled "Mutual Confidentiality Agreement," by sharing information with third parties. The agreement is governed by the laws of New York. 
The agreement is dated September 15. The preamble provides that the parties are making confidential information available to each other in connection with the "Potential Transaction," defined as the acquisition of Peruvian oil and gas companies (NYSCEF 24, at 1). "Confidential Information" is information furnished by one party to the other party in connection with a "Potential Transaction" (id., ¶ 1). Each party agrees to use "Confidential Information" only to determine whether it wishes to enter a "Potential Transaction" with the other party, and not to disclose any "Confidential Information" to others. 
"Unless and until a definitive agreement has been executed and delivered by both Parties, neither Party shall have any obligation to the other by virtue of this Agreement (including, without limitation, any obligation to consummate a Potential Transaction), except for those express obligations set forth herein" (NYSCEF 24, ¶ 6). 
"Limitation on Damages. Each party waives to the fullest extent permitted by law, any right to consequential, special, punitive, exemplary, incidental, or indirect damages in any dispute in connection with this agreement" (NYSCEF 24, ¶ 13). 
Defendant states that the cause of action for breach of the confidentiality agreement should be dismissed because the complaint provides none but conclusory statements about the information that defendant allegedly shared with third parties. Paragraph 37 of the complaint alleges that plaintiff shared with defendant extensive analyses of OIG's business activity. Paragraph 102 alleges that plaintiff enjoyed a substantial competitive advantage over others in the industry by virtue of various trade secrets and confidential information that are not known or readily available to the general public. Paragraph 103 alleges that "[t]his information was gleaned over 15 years of owning and managing the multiple complex businesses of [OIG], navigating the Peruvian oil and gas sector and establishing a network of Peruvian contacts. [Plaintiff's] knowledge is impossible to otherwise acquire or duplicate." 
Although nothing is revealed about the composition of the confidential information, the allegations are sufficient to sustain the cause of action. "Statements in a pleading shall be sufficiently particular to give the court and parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved and the material elements of each [*6]cause of action or defense" (CPLR 3013). At this stage of the litigation, the allegations give defendant sufficient notice about the information that it allegedly wrongly used. 
Defendant further argues that the damages sought by plaintiff are not available under the limitation of damages provision of the confidentiality agreement, warranting dismissal of this claim. According to defendant, the complaint seeks damages based on a claim for "loss of a business opportunity," which is consequential damages barred by the agreement. 
Contractual provisions that limit liability or damages are enforceable (Ambac Assur. Corp. v Countrywide Home Loans, Inc., 31 NY3d 569, 581 [2018]). Damages based on lost profits and loss of a business opportunity may be barred by a confidentiality agreement, however, general damages, also called direct damages, are not barred (Aetna Cas. & Sur. Co. v Kidder, Peabody & Co., 246 AD2d 202, 209 [1st Dept 1998]).[FN1]
 
Under certain circumstances, lost profits may qualify as general damages (Biotronik A.G. v Conor Medsystems Ireland, Ltd. 22 NY3d 799, 805 [2014]). This occurs when the non-breaching party bargained for lost profits and those are "the direct and immediate fruits of the contract" (id. at 806 [citation and internal quotation marks omitted]). Lost profits as a measure of general damages will be imposed on the defaulting party if these damages were within the contemplation of the parties at the time of contracting (id.; Kenford Co. v County of Erie, 73 NY2d 312, 319 [1989]). 
Here, however, damages based on lost profits (or 'lost opportunity') are not available. Section 6 of the confidentiality agreement provides that the parties do not yet have a definitive agreement and that they have no "obligation to consummate a Potential Transaction," until there is a definitive agreement. This provision shows that the parties did not contemplate damages based on lost profits from the failure to acquire OIG at the time that they entered into the confidentiality agreement. The agreement acknowledges that the parties had no obligation to consummate the acquisition of OIG, so it cannot be said that the parties contemplated or bargained for damages based upon lost profits, premised upon an acquisition the parties both agreed may not occur.
However, to the extent that the complaint sufficiently alleges injurious conduct, it also sufficiently implies damages stemming from the conduct. "There is no requirement that the measure of damages shall be correctly set forth in a complaint, the test being merely whether or not the complaint sets forth allegations from which damages can properly be inferred" (Daukas v Shearson, Hammill & Co., 26 AD2d 526, 526 [1st Dept 1966]). The complaint will not be dismissed because of insufficient pleading of damages. 

V. Choice of Law
The second cause of action seeks a declaratory judgment that the parties entered a partnership, the third is for breach of the partnership agreement, and the fourth cause of action is for breach of the fiduciary duty that partners owe to each other. 
Defendant bases its motion to dismiss on New York law. Plaintiff contends that Texas law applies. Plaintiff asserts that the parties formed a partnership in Texas, both parties are sited in Texas, and all communications and other events pertaining to this complaint occurred in [*7]Texas.
In light of the parties' different approaches, a choice of law analysis is required. The court must first assess whether there is an actual conflict between the laws of the jurisdictions concerning the issue at hand (TBA Global, LLC v Proscenium Events, LLC, 114 AD3d 571, 572 [1st Dept 2014]; TBA Global, LLC v Proscenium Events, LLC, 114 AD3d 571, 572 [1st Dept 2014]). An actual conflict exists where jurisdictions provide different substantive laws which could result in a "significant possible effect on the outcome of the trial" (Elmaliach v Bank of China, Ltd., 110 AD3d 192, 200 [1st Dept 2013] [internal quotation marks and citation omitted]). 
In New York, an indispensable element of an agreement to form a partnership or joint venture is a promise to share in the profits and losses of the business (Matter of Steinbeck v Gerosa, 4 NY2d 302, 317 [1958]; Lebedev v Blavatnik, 193 AD3d 175, 185—86 [1st Dept 2021]; Slabakis v Schik, 164 AD3d 454, 455 [1st Dept 2018]). Shared losses are an "essential element" of a partnership agreement (Moses v Savedoff, 96 AD3d 466, 470 [1st Dept 2012]; Magnum Real Estate Servs., Inc. v 133-134-135 Assoc., LLC, 59 AD3d 362, 363 [1st Dept 2009] [joint venture]; Prince v O'Brien, 256 AD2d 208, 212 [1st Dept 1998]). 
In Texas, "an agreement by the owners of a business to share losses is not necessary to create a partnership" (Texas Business Organizations Code [Tex Bus Orgs] § 152.052 [c]; Nguyen v Hoang, 507 SW3d 360, 374 [Tex App 2016]). In Texas, parties could form a partnership without agreeing to share losses, which is not the law in New York. This is a substantive conflict which could lead to different trial outcomes in the jurisdictions. Given this conflict, the court must next determine which state's law applies. 
New York employs the "center of gravity" or "grouping of contacts" approach to determine conflict of law questions in contract cases (Zurich Ins. Co. v Shearson Lehman Hutton, 84 NY2d 309, 317 [1994]). The Restatement lists five significant contacts in a contract case: the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation, and place of business of the parties (Restatement Second, Conflict of Laws § 188 [2]). Here, the oil company that is the subject of the alleged partnership is in Peru, but the other significant contacts occurred in Texas. As Texas has more contacts with this action than New York, Texas law will be applied.[FN2]

VI. Statute of Frauds Under Texas Law
Defendant argues that the New York statute of frauds bars any claim based on the partnership agreement. In Texas and New York, an agreement which cannot be performed within one year from the date of making the agreement, must be in writing (Gen Oblig Law § 5-701[a] [1]; Tex Bus & Com Code § 26.01 [b] [6]). Whether an agreement falls within the statute of frauds is a question of law (Beverick v Koch Power, Inc., 186 SW3d 145, 149 [Tex App 2005]). 
A contract that could possibly be performed within a year, however improbable [*8]performance within one year may be, does not fall within the statute of frauds Beverick v Koch Power, Inc., 186 SW3d 145, 149 [Tex App 2005]; Cuidado Casero Home Health of El Paso, Inc. v Ayuda Home Health Care Servs., LLC, 404 SW3d 737, 752 [Tex App 2013][a non-compete agreement that specified that it applied during the course of employment and the twelve-month period thereafter was not within the statute of frauds, where the agreement did not state that it was not to be performed within a year after execution and "conceivably could have been accomplished within one year"]).
In the absence of a known date when performance will be completed, the statute of frauds does not apply if performance could conceivably be completed within one year of the agreement's making (Young v Ward, 917 SW2d 506, 509 [Tex App 1996]). 
Defendant argues that the agreement could not be performed within one year from the making, due to the non-compete clause which barred any discussion or negotiation regarding any other transaction involving OIG. However, the partnership agreement does not limit the time for the parties' performance, and within one year, the parties could have presumably purchased OIG, and drawn up an agreement for BidCo. The statute of frauds does not apply to the partnership agreement. 

VII. Partnership under Texas Law
Whether the allegations in the complaint sufficiently allege the existence of a partnership under Texas law will be determined under the principles of partnership formation and contract formation (see Rainier Southlake DST v Woodbury Strategic Partners Fund, LP, 2017 WL 6047725, *5, *7, 2017 Tex App LEXIS 11407, *14, *17 [Tex App]). 
In Texas (as in New York), a joint venture is governed by the same rules as a partnership (Texas Dept. of Family & Protective Servs. v Atwood, 176 SW3d 522, 535 [Tex App 2004]: Heinrich v Wharton County Livestock, Inc., 557 SW2d 830, 833 [Tex App 1977]). "[A]n association of two or more persons to carry on a business for profit as owners creates a partnership, regardless of whether: (1) the persons intend to create a partnership; or (2) the association is called a 'partnership,' 'joint venture,' or other name" (Energy Transfer Partners, L.P. v Enterprise Prods. Partners, L.P., 593 SW3d 732, 737 [Tex Sup 2020], quoting Tex Bus Orgs § 152.051 [b]). A partnership relationship must be based on an agreement, express or implied (City of Corpus Christi v Bayfront Assocs., Ltd., 814 SW2d 98, 107 [Tex App 1991]). An oral agreement to form a partnership is recognized (Malone v Patel, 397 SW3d 658, 674 [Tex App 2012]). 
Texas sets forth five factors that a court should review in determining whether a partnership exists: (1) receipt or right to receive a share of profits of the business; (2) expression of an intent to be partners in the business; (3) participation or right to participate in control of the business; (4) agreement to share or sharing either the losses or the liability of the business; and (5) agreement to contribute or contributing money or property to the business (Tex Bus Orgs § 152.052 [a]; Houle v Casillas, 594 SW3d 524, 548 [Tex App 2019]). 
Whether a partnership exists must be determined by examining the totality of the circumstances (Ingram v Deere, 288 SW3d 886, 903-04 [Tex Sup 2009]). Evidence of none of the factors will preclude the recognition of a partnership, and evidence of only one factor will also normally be insufficient to establish the existence of a partnership (id. at 904). Not all of these factors need be present for a partnership to exist and no one factor is dispositive (McDowell v McDowell, 143 SW3d 124, 129 [Tex App 2004]). 
Profit sharing is one of the two "most important" factors in determining the existence of a [*9]partnership, along with control over the business (Stephens v Three Finger Black Shale Partnership, 580 SW3d 687, 713 [Tex App 2019]). To determine whether the parties expressed an intent to be in a partnership, the court may look to their writings and conduct (Westside Wrecker Serv. v Skafi, 361 SW3d 153, 168 [Tex App 2011]). Evidence of expressions of intent could include the parties' statements that they are partners or a signed partnership agreement or one party holding the other out as a partner (Westside, 361 SW3d at 168). This inquiry is "separate and apart from the other factors [evidencing partnership] and should only include evidence not specifically probative of the other factors" (id.). 
Here, the parties allegedly told each other that they were partners, and their emails to each other refer to a partnership and the acquisition of OIG. Although the parties also repeatedly discussed signing or finalizing the agreement and never did so and disagreed on terms. With respect to profit sharing, the agreement's provision that defendant will be compensated for its services in the sales process does not show an agreement to share BidCo's profits. Plaintiff argues that as 10% owner of the partnership, defendant would have been automatically entitled to 10% of the profits. However, the agreement makes no provision for profit sharing.
A partnership relationship does not exist unless each party has a right to control and manage the enterprise along with the other party (Houle, 594 SW3d at 549). Control is the right to make executive decisions (id., citing Rojas v Duarte, 393 SW3d 837, 843 [Tex App 2012]). Indicia of control includes the right to write checks on the business account, control over and access to the records, and the receipt and management of assets and monies (Stephens, 580 SW3d at 712; Rojas, 393 SW3d at 843). The agreement gives sole control of BidCo to plaintiff, including the "sole discretion" to terminate the agreement and does not mention defendant's role. Plaintiff had final say over the bidding process and the decision to go forward if OIG accepted a bid. 
Although an agreement to share losses is not a necessary element of a partnership, it is nonetheless indicative of one (Stephens, 580 SW3d at 712). Here, provision is made neither for sharing losses nor third-party liabilities, per Tex Bus Orgs § 152.052 (a) (4) (A) (B). 
To create the required community of interest in an enterprise, each partner must contribute money, effects, labor, skill, or a combination of any of them, into the common trade, business, or profession (Nguyen, 507 SW3d at 375). Labor and time can be the equivalent of contributing money or property to the partnership (Houle, 594 SW3d at 551). In this case, defendant's labor consisted of negotiating with the sellers, signing a confidentiality agreement with them, and putting in proposals to buy OIG. The agreement does not state what if anything that defendant would have contributed to BidCo once it was formed and OIG was acquired. This element is not sufficiently alleged. In total, plaintiff has failed to sufficiently plead the factors that show the existence of a partnership. 
Under contract formation principles, where the parties have agreed that no binding or enforceable obligations will be created unless certain conditions are met those conditions must be met for a partnership to exist (Energy, 593 SW3d at 741; Arnold v Caprielian, 437 SW2d 620, 625 [Tex App 1969]). Where parties agree that they are not partners until they sign a formal written agreement, no partnership exists until the signatures are made (Energy, 593 SW3d at 741; also Anubis Pictures, LLC v Selig, 2021 WL 805214, *13, 2021 Tex App LEXIS 1580, *40 [Tex App 2021]; Wright v Hernandez, 469 SW3d 744, 758 [Tex App 2015] [about contracts in general]). 
As stated above, section 15 of the partnership agreement provides that it becomes [*10]effective when signed. In addition, section 6 of the confidentiality agreement states that the parties have no obligation to each other, apart from the obligations therein, until they have executed a definitive agreement. The agreement was never signed and did not become enforceable. The second, third, and fourth causes of action based on partnership are dismissed. 

VIII. Fifth Cause of Action - misappropriation of trade secrets 
 Sixth Cause of Action - unfair competition
The parties apply New York law to these claims, which are based on defendant's misappropriation of confidential information, described in the confidentiality agreement as information furnished by one party to the other party in connection with purchasing Peruvian oil companies. As defendant argues, these claims restate the claims for breach of the confidentiality agreement. The unfair competition and misappropriation claims are predicated on the same conduct prohibited by the parties' confidentiality contract. For that reason, they are dismissed (Saulsbury v Durfee, 201 AD3d 1318, 1323 [4th Dept 2022]; Linkable Networks, Inc. v Mastercard Inc., 184 AD3d 418, 418 [1st Dept 2020]). 

IX. Choice of Law -Tort Law
The complaint alleges that defendant engaged in fraud, promissory estoppel, and negligent misrepresentation. When deciding conflict of law questions concerning tort law, New York uses "interest analysis" to determine which jurisdiction has the greater interest in having its law applied in the litigation (Elmaliach, 110 AD3d at 202). "The interest analysis addresses two inquiries: (1) what are the significant contacts and in which jurisdiction are they located; and (2) whether the purpose of the law [at issue] is to regulate conduct or allocate loss" (Padula v Lilarn Props. Corp., 84 NY2d 519, 521 [1994] [citation and internal quotation marks omitted]). The significant contacts are usually the parties' domiciles and the location of the tort (Elmaliach, 110 AD3d at 202). As already determined, Texas has more significant contacts to this litigation than New York. The alleged misconduct occurred in Texas and the parties are domiciled there. Concerning the second part of interest analysis, conduct-regulating rules govern conduct in order to prevent injuries from occurring (Padula, 84 NY2d at 522). Loss-allocating rules are "those which prohibit, assign, or limit liability after the tort occurs" (id.; Schultz v. Boy Scouts of Am., 65 NY2d 189, 198 [1985]). If the conflicting laws are conduct-regulating, the law of the jurisdiction where the tort occurred will generally apply, because that is the jurisdiction with the greatest interest in regulating behavior within its borders (Padula, 84 NY2d at 522; Cooney v Osgood Mach., 81 NY2d 66, 72 [1993]). 
Fraud and negligent misrepresentation are conduct regulating rules (Seipel v Jenkens & Gilchrist, P.C., 341 F Supp 2d 363, 377 [SD NY 2004]; HSA Residential Mtge. Servs. of Texas v Casuccio, 350 F Supp 2d 352, 364 [ED NY 2003]). The same applies to promissory estoppel, which concerns promises that subsequently result in injury to the person who relied on the promises. The rules by which damages can be recovered on fraud claims are conduct regulating; the rules regulate which types of injuries must be shown to constitute a tort (AHW Inv. Partnership, MFS, Inc. v. Citigroup Inc., 661 Fed Appx 2, 4-5 [2d Cir 2016]). 

X. Cause of Action Seven - Fraud
Cause of Action Eight - Promissory Estoppel
 Cause of Action Nine - Negligent Misrepresentation
These claims allege that defendant repeatedly represented to plaintiff that they were [*11]partners seeking to buy OIG. Allegedly, defendant's representations were false and made to induce plaintiff to act in partnership with defendant instead of proceeding with a different partner and to disclose proprietary information about OIG that was necessary to craft a successful bid. "Based on information and belief," at the time that defendant made some of the representations, it had already begun working with outside investors to craft an alternative deal that would cut out OEP" (NYSCEF 20, ¶ 117). 
Using New York law, defendant argues that the misrepresentation claims must be dismissed because plaintiff does not allege reasonable reliance and the damages sought by plaintiff, exemplary damages and benefit of the bargain, are not available as remedies for fraud. Moreover, plaintiff fails to plead unconscionable injury or inequality between the parties as required for promissory estoppel and a special relationship as required for negligent misrepresentation. Plaintiff contends that Texas law allows these claims to be maintained. As stated above, Texas law applies. 
In New York, only out of pocket expenditures are recoverable on a fraud claim, and profits which would have been realized if there had been no fraud cannot be recovered (New York Wheel Owner LLC v Mammoet Holding B.V., 481 F Supp 3d 216 [SD NY 2020]; Connaughton v Chipotle Mexican Grill, Inc., 29 NY3d 137, 142-43 [2017]). Punitive or exemplary damages are recoverable in a fraud action where the defendant's conduct evinces a high degree of moral turpitude and demonstrates such wanton dishonesty as to imply a criminal indifference to civil obligations (Errant Gene Therapeutics, LLC v Sloan-Kettering Inst. for Cancer Research, 174 AD3d 473, 475-476 [1st Dept 2019]). 
Texas recognizes two measures of direct damages for common-law fraud: out-of-pocket damages, measured by the difference between the value expended and the value received, and benefit-of-the-bargain damages, measured by the difference between the value as represented and the value received (Adam v Marcos, 620 SW3d 488, 508 [Tex App 2021]; Samson Lone Star Ltd. Partnership v Hooks, 497 SW3d 1, 19 [Tex App 2016]). Benefit of the bargain damages include profits that would have been made had performance occurred as promised (id.). Both kinds of damages are recoverable for fraudulent inducement, "but if a promise to perform is unenforceable, the benefit-of-the-bargain measure is not available because one can have no compensable expectancy from a bargain that is not binding" (Anderson v Durant, 550 SW3d 605, 614 [Tex 2018]). As the partnership agreement is not binding, plaintiff may not recover lost profits. However, exemplary damages may be recoverable, as Texas allows plaintiffs to recover exemplary damages with respect to harm resulting from fraud and, unlike New York, does not require wanton conduct by defendants (Texas Civil Practice & Remedies Code § 41.003 [a]; Home Comfortable Supplies, Inc. v Cooper, 544 SW3d 899, 906 [Tex App 2018]). 
A common-law fraud claim requires "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury" (Zorrilla v Aypco Constr. II, LLC, 469 SW3d 143, 153 [Tex Sup 2015] [internal quotation marks and citation omitted]). The false representation in a fraud claim must concern a material fact rather than an opinion, judgment, probability, or expectation (Harding Co. v Sendero Resources, Inc., 365 SW3d 732, 747 [Tex App 2012]). However, a promise to perform an act in the future can also amount to fraud if made with the intention to deceive the other party and with no intention of performing the promised act (Spoljaric v Percival Tours, Inc., 708 SW2d 432, 434 [Tex Sup 1986]). 
The complaint alleges that defendant made a false representation by repeatedly promising that it was or would be plaintiff's partner with no intention of being a partner. Relying on that misrepresentation, plaintiff acted in partnership with defendant instead of proceeding with a different partner. This states a claim for fraud. 
Fraud, negligent misrepresentation, and promissory estoppel require that the misled party have placed actual and justifiable reliance on the misrepresentations (Grant Thornton LLP v Prospect High Income Fund, 314 SW3d 913, 923 [Tex Sup 2010]; Frost Crushed Stone Co. v Odell Geer Const. Co., 110 SW3d 41, 44 (Tex App 2002]). Justifiable reliance can be negated as a matter of law when there are "red flags" that signal reliance is unwarranted (Barrow-Shaver Resources Co. v Carrizo Oil & Gas, Inc., 590 SW3d 471, 501 [Tex Sup 2019]; Darnell v Rogers, 588 SW3d 295, 305 [Tex App 2019]). 
In this case, there were red flags. The complaint states that, in September, defendant falsely told plaintiff that it could not share information from the virtual data room unless they were 50/50 partners (NYSCEF 20, ¶ 39). Also, defendant subsequently made a false statement about plaintiff's escrow account to OIG (id., ¶ ¶ 42, 50). Whether plaintiff was justified in continuing to rely on defendant after these alleged untruths and whether it actually relied are questions for summary judgment or trial. 
In New York, a plaintiff has a claim for negligent misrepresentation when the parties have a special or privity-like relationship imposing a duty on the defendant to convey correct information to the plaintiff (J.A.O. Acquisition Corp. v. Stavitsky, 8 NY3d 144, 148 [2007]). The elements of negligent misrepresentation in Texas are: 
"(1) defendant's representation to a plaintiff in the course of defendant's business or in a transaction in which the defendant had an interest; (2) defendant's providing false information for the guidance of others; (3) defendant's failure to exercise reasonable care or competence in obtaining or communicating information; (4) plaintiff's justifiable reliance on defendant's representation; and (5) defendant's negligent misrepresentation proximately causing the plaintiff's injury" 
(Willis v Marshall, 401 SW3d 689, 698 [Tex App 2013]; Miller v LandAmerica Lawyers Title of El Paso, 362 SW3d 842, 845 [Tex App 2012]). "The theory of negligent misrepresentation allows plaintiffs who are not parties to a contract for professional services to recover from the contracting professionals" (Willis, 401 SW3d at 698; see International Bank of Com.-Oklahoma v Lane Gorman Trubitt, LLC, 2022 WL 3088577, *5, 2022 Tex App LEXIS 5504, *15 [Tex App 2022]). Here it is not alleged that defendant was in the business of contracting for professional services, or that advice given by defendant about buying OIG was amiss in any manner, or that defendant had a pecuniary interest in OIG, apart from a possible future interest if the parties' bids succeeded. 

The false information supplied in a negligent misrepresentation case must be a misstatement of existing fact, not a promise of future conduct (Rhey v Redic, 408 SW3d 440, 452 [Tex App 2013]). A promise to do or to refrain from doing an act in the future ordinarily is not actionable as negligent misrepresentation because it does not concern an existing fact (Maddox v Vantage Energy, LLC, 361 SW3d 752, 760 [Tex App 2012]). Here it is alleged that defendant promised that the parties were or would be in a partnership. This is a promise to do an act in the future and of defendant's intentions, not a misrepresentation of fact. In New York, promissory estoppel is "reserved for that limited class of cases where the circumstances are such as to render [*12]it unconscionable to deny the promise upon which the plaintiff relied" (Matter of Hennel, 29 NY3d 487, 495 [2017] [internal quotation marks and citation omitted]). In Texas, the element of unconscionability is not required. 
Although promissory estoppel is normally a defensive theory used to bar the application of the statute of frauds, it is available as an affirmative claim for relief to a promisee who relied to its detriment on an otherwise unenforceable promise (Blackstone Med., Inc. v Phoenix Surgicals, L.L.C., 470 SW3d 636, 654-655 [Tex App 2015]; Kenny v Porter, 604 SW2d 297, 303 [Tex Civ App 1980]). In this form, the party asserting promissory estoppel may recover not lost profits but the money expended in relying on the promise (Lamajak, Inc. v Frazin, 230 SW3d 786, 794 [Tex App 2007]). 
To plead promissory estoppel, a plaintiff must allege: (1) a promise by the defendant; (2) foreseeability by the defendant that the plaintiff will rely on the promise; and (3) substantial reliance by the promisee to his or her detriment (id.). The complaint sufficiently alleges these elements. 

 XI. Conclusion
Accordingly, it is hereby 
ORDERED that the motion to dismiss is granted to the extent that the second, third, fourth, fifth, sixth, and ninth causes of action are dismissed, and the motion is otherwise denied; and it is further 
ORDERED that defendant shall answer the complaint within 30 days of the date of this decision. 
DATE 05/24/2023
ROBERT R. REED, J.S.C.

Footnotes

Footnote 1: Nominal damages are also available in breach of contract cases (Matter of Schleifer v Yellen, 158 AD3d 512, 513 [1st Dept 2018]). 

Footnote 2: The choice of law analysis concerns only the substantive law of the relevant jurisdictions. Matters of procedure are governed by the law of the forum (Tanges v Heidelberg N. Am., 93 NY2d 48, 53-54 [1999]).